**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| IN RE ADELPHIA COMMUNICATIONS CORPORATION SECURITIES AND DERIVATIVE LITIGATION | 03 MDL 1529 (JMF) |
| This document relates to: <br><br> *Island Partners, et al. v. Deloitte & Touche LLP* (05-CV-2770) | |
| JAMES RIGAS, JOHN RIGAS, ZITO I, L.P. and ZITO MEDIA, L.P.,<br>                              Plaintiffs,<br><br>v.<br><br>DELOITTE & TOUCHE, LLP,<br>                              Defendant. | |

## <u>FIRST AMENDED COMPLAINT</u>

Plaintiffs James Rigas, John Rigas, Coudersport Television Cable Company, Highland Holdings LP, Highland Preferred Communications 2001, LLC, Highland Prestige Georgia, Inc., Highland Video Associates, L.P., Hilton Head Communications, L.P., Zito I, L.P., and Zito Media, L.P. hereby bring this action against Deloitte & Touche LLP, and for their Amended Complaint allege as follows:

### <u>The Parties</u>

1.     Plaintiff James Rigas is an individual residing at 105 East 3rd Street Coudersport, PA 16915.

2.     Plaintiff John Rigas is an individual incarcerated at FCI-Allenwood with a permanent address of 769 Route 49 East, Coudersport, PA 16915.

3.     Plaintiff Zito I, L.P. is a Delaware limited partnership, with its principal place of business located at 106 Steerbrook Road, Coudersport, PA 16915.  Zito I is the successor in

interest to the litigation rights of Highland Holdings, Highland Preferred Communications 2001, LLC ("Highland Preferred"), Highland Prestige Georgia, Inc. ("Highland Prestige"), Highland Video Associates, L.P. ("Highland Video")  and Hilton Head Communications, L.P. ("Hilton Head").[1]

4.       Plaintiff Zito Media, L.P. is a Delaware limited partnership, with its principal place of business located at 106 Steerbrook Road, Coudersport, PA 16915.  Zito Media is the successor in interest to Coudersport Television Cable Company ("Coudersport TV") and a subsidiary of Zito I.

5.       Defendant Deloitte & Touche LLP ("Deloitte") is a Delaware limited liability partnership, one of the largest accounting firms in the world.  Deloitte represents itself as having specialized expertise in the auditing of cable companies.

## Jurisdiction and Venue

6.       This Court has jurisdiction over this dispute and the parties pursuant to Rule 7.4 of the Rules of Procedure of the Judicial Panel on Multidistrict Litigation, 28 U.S.C. § 1407, and the Conditional MDL Transfer Order entered on March 9, 2005 (Civil Action No. 1:03-md-01529, Doc. #263).

7.       The Court of Common Pleas of Philadelphia County, Pennsylvania has jurisdiction over this dispute and the parties pursuant to 42 Pa. C.S.A. § 5301.

8.       Venue is proper in the Court of Common Pleas of Philadelphia County, Pennsylvania pursuant to Pa. R. Civ. P. 2130(a) as Deloitte regularly conducts business in Philadelphia County, including maintaining a major office there.

---

[1] By Order dated May 7, 2013, this Court granted Plaintiffs leave to add additional parties in their Amended Complaint. (Civil Action No. 1:03-md-01529, Doc. #790).

10747633_10

**Background**

9.      Plaintiff John J. Rigas is a World War II veteran and graduate of Rensselaer Polytechnic Institute.

10.      John Rigas was a pioneer in the cable television industry.  In 1952, when only 27 years old, John paid $300 for a cable television franchise for the small, remote town of Coudersport, Pennsylvania.  John devoted the next 50 years of his professional life to cable television and the company that would eventually become Adelphia Communications Corporation ("Adelphia").[2]

11.      Plaintiff James P. Rigas is a graduate of Harvard College and has a Juris Doctor degree and M.A. degree in Economics from Stanford University.  He joined Adelphia in 1986.

12.      In 1979, after graduating from the Wharton School of the University of Pennsylvania with a degree in economics, Timothy J. Rigas joined Adelphia.

13.      Michael J. Rigas joined Adelphia in 1981.  Michael Rigas is a graduate of Harvard College and received a Juris Doctor degree from Harvard Law School.[3]

14.      James, Timothy and Michael Rigas are the sons of John Rigas.

**Retention of Defendant Deloitte**

15.      In or about 1982, the predecessor to Deloitte solicited John Rigas to provide accounting and auditing services to him and his companies.

16.      Although John was already using another "Big 8" accounting firm, Deloitte enticed him to switch to Deloitte by representing itself as having specialized knowledge of the

---

[2] Prior to going public in 1986, Adelphia Communications Corporation was one of several cable television companies owned in whole or part by John Rigas.   Throughout this Complaint, when referring to events after July 1, 1986, "Adelphia" will refer to the public company.  When referring to events prior to July 1, 1986, "Adelphia" refers generally to the group of cable televisions companies owned in whole or in part by John Rigas.

[3] Plaintiffs John Rigas and James Rigas, along with Michael and Timothy Rigas, will  be collectively referred to as "the Rigases".  The Rigases along with members of their immediate family will be referred to as "the Rigas Family."

10747633_10

cable industry and pledging that he would have access to all aspects of Deloitte's expertise. Based upon these representations, John Rigas hired Deloitte in 1982.

18.     At the time Deloitte was retained, John owned several cable companies and owned several other cable companies along with partners.

### The Decision to Take Adelphia Public

18.     In the 1985-1986 timeframe, John Rigas was interested in purchasing a cable system in Buffalo.  One of his advisors, Paine Webber, suggested that he consider combining some of his cable companies and doing an initial public offering to raise the funds necessary to purchase the Buffalo system.

19.     Having no experience with running a public company, John Rigas and his sons, who ran the companies along with him, turned to Deloitte for guidance and advice regarding Paine Webber's suggestion.

20.     Knowing that none of the four Rigases held an accounting degree or had any experience running a public company, Deloitte assured the Rigases that it would guide them through the process of going public and assist them with meeting the requirements of a public company going forward, including meeting SEC requirements.

21.     Based upon Deloitte's promise of continued assistance and support, on July 1, 1986, the Rigases reorganized five cable television companies, principally owned by the Rigas Family, into a holding company under the Adelphia Communications Corporation name.

22.     Adelphia then became a public company with the initial public offering of Class A Common Stock and its Senior Subordinated Notes.   The Rigas family retained voting control over Adelphia by virtue of their ownership of Class B common stock, each share of which carried ten (10) votes as opposed to Class A shares which carried one (1) vote each.

23.     All four of the Rigases served on Adelphia's Board of Directors after it became a public company and through May 2002.

24.     At the time of the IPO, a few of the cable television companies which the Rigas Family controlled, but which were owned in partnership with third parties, were not included in the reorganized public Adelphia.

25.     As fully disclosed to the public, the Rigas Family continued to privately control those cable television companies while Adelphia provided management and consulting services to these privately-owned companies.

26.     Over the years, the Rigas family bought and sold several other privately-held cable systems.

27.     During the time period relevant to this litigation, the Rigas family privately owned several cable companies, including Coudersport TV, Highland Preferred, Highland Prestige, Highland Video and Hilton Head (collectively, the "Managed Entities"), that were managed by Adelphia pursuant to certain management agreements.

28.     The Managed Entities had no direct employees.  Instead, under the management agreements, Adelphia provided, *inter alia*, all employees and administrative functions to the Managed Entities, including obtaining professional advice for such entities, in exchange for a management fee.

29.     At all times relevant hereto, Deloitte was thoroughly familiar with the management arrangement between Adelphia and the Managed Entities, including that it would be providing accounting and other advice to Adelphia on behalf of, and for use by, the Managed Entities.

10747633_10

30.     The Rigas Family also owned certain partnerships that primarily owned interests in the Managed Entities and Adelphia securities.  These partnerships and the Managed Entities will be collectively referred to as "the Rigas Family Partnerships" or "RFPs."

31.     RFP Highland Holdings owned interests in several of the Managed Entities, as well as Adelphia securities.

32.     RFP Highland Preferred was a subsidiary of Highland Holdings formed for the purposes of acquiring Adelphia securities.

33.     Deloitte understood that Adelphia, the Rigases and the RFPs were inextricably intertwined given the multitude of related party transactions among them, and that they would rely upon the advice provided by Deloitte to the group, especially in terms of structuring, accounting for and disclosure of related party transactions among the group.

34.     At the time Adelphia went public, it had approximately 120,000 subscribers. During its first year as a public company, Adelphia had already nearly tripled in size to approximately 330,000 subscribers.   Under the leadership of the Rigases, by 2002, Adelphia had grown into one of the largest cable television company in the United States with over 5 million subscribers.

<u>**Services Provided by Deloitte**</u>

35.     Not only did the Rigases lack accounting degrees, but also, from 1986 through 2002, Adelphia had few employees with any significant accounting experience.

36.     Given this lack of accounting expertise, the Rigases and Adelphia looked to Deloitte not only to confirm the propriety of its accounting decisions but also to instruct Adelphia in the first instance on the appropriate accounting for significant transactions.

10747633_10

37.     The parties understood that Adelphia was responsible for keeping clear and detailed books and records, and that Deloitte would then advise how entries in such books and records should be accounted for in the various financial statements.

38.     Consistently, pursuant to its Engagement Letters with Adelphia and/or the Managed Entities, Deloitte agreed to provide assistance regarding issues as they should arise throughout the year and encouraged the Plaintiffs to reach out to Deloitte for such assistance.

39.     The Adelphia accounting staff consulted Deloitte regularly, especially since the staff did not even have access to the appropriate accounting literature from which it could make such decisions if it had so desired.

40.     Deloitte also agreed to provide advice to management on matters observed during its services and possible ways to improve the efficiency of Adelphia's operations, or other recommendations regarding Adelphia's internal control structure.

41.     Deloitte was also responsible for issuing numerous audit opinions for financial statements of Adelphia and/or the Managed Entities, including opinions that accompanied Adelphia's financial statements in public filings and opinions issued in conjunction with credit facilities of Adelphia and/or the Managed Entities.

42.     Deloitte's opinion was required to be based upon generally accepted auditing standards (GAAS) and generally accepted accounting principles (GAAP), and all of Deloitte's audit reports issued so stated without any exception.

43.     In addition, Deloitte was engaged to opine upon the combined financial condition and results of operations of Managed Entities and Adelphia subsidiaries which were parties to certain co-borrowing credit agreements.

44.     Deloitte's opinion in connection with such combined financial information was required to be based upon generally accepted auditing standards and generally accepted accounting principles, and Deloitte's audit reports in each instance so stated without any exception.

45.     Deloitte's engagement also included the obligation to conduct quarterly reviews pursuant to appropriate professional standards.

46.     As part of its quarterly reviews, Deloitte agreed to, *inter alia*:

(a) update and appropriately document the status of completed acquisitions and potential acquisitions;

(b) review for reasonableness the related party transaction schedules and balance sheet classifications; and

(c) review the debt compliance calculations relating to outstanding bank debt.

47.     As detailed in its Audit Planning Memos, Deloitte's audits were more detailed than would be prescribed for a typical client because Adelphia and related entities had been designated "much greater than normal risk." Thus, for example, despite the ongoing relationship between Adelphia and Deloitte, Deloitte performed procedures consistent with analyzing a new client for engagement.

48.     Deloitte determined that the Adelphia engagement posed a "much greater than normal risk" based on the following factors:

(a)  management was dominated by the Rigas Family;

(b) there were a significant number of material related party transactions that affect each individual reporting entity, and such transactions could affect the debt compliance calculations for the entities;

8

(c) Adelphia was highly leveraged, and a variety of covenant restrictions were associated with the debt agreements that potentially could impact financial results; and

(d) the cable television operations of Adelphia could be adversely affected by the various changes and developments in governmental regulations, including the 1992 Cable Act and The Telecommunications Act of 1996.

49.     As a result of Deloitte's risk determination, Adelphia was included in the firm's risk management program, and Deloitte tailored its audits and advice accordingly, based on its continuing relationship with Adelphia, its prior experience with the client, and the results of prior Adelphia audits.

50.     For example, as a result of the significant number of related party transactions, Deloitte assigned a senior auditor with prior client experience to identify and disclose all related party transactions. Deloitte also required additional procedures to be performed by a senior member of the engagement team with detailed knowledge of related parties and the RFPs.

51.     In addition, the audit team's judgment concerning significant issues was subject to multiple levels of review at Deloitte, including engagement partners, concurring partners, and risk partners.

52.     Deloitte also determined to increase the professional skepticism of all personnel involved in the audit engagement to ensure that accounting estimates, related party transactions, and transactions in the normal course of business were appropriately identified and disclosed.

53.     Further, and consistent with its agreement going back to 1986 when Adelphia went public, Deloitte expressly agreed to provide advice with respect to SEC reporting issues and approved all press releases containing financial information prior to their release.

54.     Deloitte also provided tax services for Plaintiffs.

55.     As Adelphia grew, so did Deloitte's involvement.  Deloitte was "on the ground" at Adelphia's headquarters in Coudersport for numerous weeks throughout each year and was paid millions of dollars.

### Deloitte's Advice to the Rigases Regarding Adelphia's IPO

56.     Having no experience or knowledge regarding accounting for, reporting of or requirements of a public company, the Rigases relied upon Deloitte – the self-professed accounting experts in the cable industry – to advise them regarding accounting and disclosure issues relating to taking Adelphia public.

57.     Deloitte audited the Rigas entities which were to make up the new public company and spent months preparing SEC financial documents for the new Adelphia.

58.     In so doing, they reviewed the cash flow management system used to manage the Rigas entities' assets.

59.     During this review, Deloitte provided advice relating to two topics that are particularly relevant to the instant litigation.

60.     First, Deloitte advised that the many millions of dollars reflected in journal entries in the books and records of the RFPs as owed by John Rigas and RFPs to the cable systems which were to comprise the soon-to-be public Adelphia would need to be repaid.  Although such loans were not evidenced by written promissory notes, Deloitte advised that the booking of the transactions through journal entries meant that the transactions were legally-enforceable loans that required repayment.

61.     Second, Deloitte advised that the multitude of receivables and payables among the Rigases and the RFPs, on the one hand, and the entities to comprise the public Adelphia, on the other, must be disclosed on a net basis.  According to Deloitte, showing each of these entities and

balances individually would be confusing to the public. Instead, they instructed that receivables and payables must be reported on a net basis.  Therefore, starting in 1986, based on Deloitte's instructions, the balances were reported on net basis.

62.     The issue of netting of affiliate receivables was subject to multiple levels of review at Deloitte, including engagement partners, concurring partners, and risk partners. Each of these partners considered the issue of netting and concluded that receivables and payables should be disclosed on a net basis.

63.     Deloitte also agreed that it was acceptable for the Rigases to borrow from Adelphia and continue the same cash flow management which existed among Adelphia, the Rigases and RFPs, including documenting such loans by journal entries.

64.     Deloitte told the Rigases that they would identify all related-party transactions as required by their audit procedures and properly include such transactions in the appropriate public documents.

65.     For the next fifteen years, based on the advice of Deloitte both at the time of the IPO and as formally confirmed throughout the years, the Rigases, RFPs and Adelphia continued to operate a cash-management system whereby transfers were made between the Rigases and RFPs, including Plaintiffs, and Adelphia, which were documented by meticulously-tracked journal entries (but not promissory notes) and disclosed to the public on a net basis.

66.     Over the years, including as members of the engagement team changed, Deloitte repeatedly reviewed  these issues and reaffirmed its initial advice; at no point did Deloitte advise that this activity was in any way illegitimate or fraudulent.

## Deloitte Advice Regarding Co-Borrowing Agreements

67.     In order to implement its business strategy of acquiring new cable systems and increasing its subscriber base by upgrading systems and providing new services, Adelphia was dependent upon substantial capital.  Adelphia raised this new capital mainly through public offerings of securities, private sales of securities to RFPs, and credit facilities.

68.     In the early to mid-1990s, Adelphia was in need of funding.  Because conditions were not favorable to selling additional Adelphia securities to the public or obtaining new credit facilities, the Rigases began looking for ways in which they could provide funding to Adelphia by purchasing additional Adelphia securities.

69.     As everyone was aware, the vast majority of Rigas Family wealth was tied up in the RFPs' Adelphia securities and cable systems.  Simply put, the Rigas Family did not have sufficient liquidity to provide Adelphia with the funding it needed, a fact well-known to the advisors for Adelphia and the Rigas Family.

70.     In 1994 and 1995, the Rigases engaged in negotiations with two third parties to invest in certain of the RFPs to raise funds for the Rigases to invest in Adelphia.

71.     Under this proposed transaction, the Rigases would contribute "substantially all" of their separate business holdings into a separate, new entity, with the investors contributing cash in exchange for an interest in the new partnership. The cash would then be used to purchase Adelphia securities.

72.     In or around January 1996, one of the investors backed out and negotiations terminated.

73.     Thereafter, efforts were made to try to find another way of generating cash to be invested in Adelphia, and negotiations began with Florida Power & Light ("FPL").   At the time,

Adelphia outside director Dennis Coyle served as FPL's general counsel.  Les Gelber, who negotiated on behalf of FPL, subsequently also became an Adelphia director.

74.     The result of those negotiations was an arrangement reflected in a 1996 Letter Agreement among an Adelphia subsidiary, an FPL subsidiary, and RFP Highland Video ("the 1996 Letter Agreement").

75.     The 1996 Letter Agreement specifically referred to RFP Highland Video's credit facility being turned into a "co-borrowing" agreement with both Highland Video and Adelphia entities as borrowers.  It also expressly contemplated that funds from that co-borrowing facility would be lent to the Rigas family for the purchase of Adelphia securities.

76.     Consistently, the Highland Video credit facility was amended and restated to add an Adelphia subsidiary as a co-borrower ("the 1996 Co-Borrowing Agreement").

77.     Without even being requested by the Rigases or Adelphia and consistent with past practice, the Deloitte engagement team initiated a thorough and exhaustive review of the 1996 Co-Borrowing Agreement.

78.     This review was conducted at the highest and most sophisticated level of Deloitte, including a review by Chet Hobert, who Deloitte represented as being one of the most highly respected technical accountants in all of Deloitte.  Deloitte expressly agreed that Mr. Hobert would advise on all key technical decisions, including SEC reporting.

79.     Mr. Hobert was specifically assigned to the Adelphia and Managed Entity engagements because of Adelphia's lack of depth in accounting rules.

80.     Mr. Hobert and others reviewed the structure of the Agreement extensively, spoke with Adelphia personnel about it and understood how it was intended to work.

81.     Specifically, Deloitte understood that the 1996 Co-Borrowing Agreement was joint and several, that all borrowers would be responsible for all borrowings made pursuant to the agreement and that the banks could look to any borrower for repayment.

82.     Deloitte concluded that the co-borrowed debt was governed by FAS 5 and instructed that the co-borrowed debt of RFP Highland Video be treated as a contingent liability. According to Deloitte, as long as the Rigas co-borrowing entity, here Highland Video, had the ability to repay the debt, the debt should not be reflected on Adelphia's balance sheet.

83.     Deloitte also understood that co-borrowing draws could be routed through the cash management system to the respective co-borrowers and advised that, while the money would flow through the central system, the "primary obligor" on whose books the debt would appear would be the borrower that used the money.

84.     After its extensive review, Deloitte also concluded that the 1996 Co-Borrowing Agreement did not present any new risk.

85.     Adelphia entities and Rigas entities entered into three additional co-borrowing agreements between 1999 and 2001.

86.     In 1999, Adelphia subsidiaries and RFP Hilton Head entered into another co-borrowing agreement ("the 1999 Co-Borrowing Agreement").

87.     In 2000, Adelphia subsidiaries and RFP Highland Prestige entered into a co-borrowing agreement ("the 2000 Co-Borrowing Agreement").

88.     In 2001, Adelphia subsidiaries and RFPs Highland Video and Coudersport entered into a co-borrowing agreement ("the 2001 Co-Borrowing Agreement").

89.     Each co-borrowing agreement was structured similar to the 1996 Agreement, with joint and several liability provisions.

14

90.     Adelphia-related entities also entered into a similar co-borrowing agreement with a non-Rigas affiliate, the accounting for which was also determined by Deloitte.

91.     Deloitte's advice with respect to each co-borrowing agreement was the same. Most importantly, Deloitte repeatedly advised that: (a) the RFP debt was considered a contingent liability of Adelphia that should not be reported on Adelphia's balance sheet provided that the Rigases had the ability to repay their portion of the co-borrowed debt; and (b) regardless of which co-borrower drew down on the facility or into which cash management account the funds were posted, the co-borrower who used the funds should record the debt on its books.

92.     Deloitte also advised that Adelphia did not need to include the total amount of debt borrowed by the Rigas co-borrowers in footnotes to Adelphia's financial statements.

93.     The Rigases and RFPs Highland Video, Highland Holdings, Hilton Head, Highland Prestige, Coudersport and Highland Preferred relied upon Deloitte's advice regarding the four Co-Borrowing Agreements when structuring transactions involving funds drawn under those Agreements.

**Deloitte Advice Regarding Related Party Transactions**

94.     Deloitte repeatedly committed to update and appropriately document the status of completed acquisitions and potential acquisitions, and review for reasonableness the related party transaction schedules and balance sheet classifications.

95.     Deloitte had full access to Adelphia's books and records, as well as the books and records of the Managed Entities, which were kept by Adelphia.  Deloitte also had full access to the RFP general ledger accounts and cash management transactions involving the RFPs, which were also kept by Adelphia.

15

96.     Neither Adelphia, the Rigases, nor the RFPs ever refused a Deloitte request for information or documentation.

97.     The RFPs' purchases of Adelphia securities were related party transactions subject to review for proper disclosure by the Deloitte engagement team.

98.     Adelphia, the Rigases and the Managed Entities were repeatedly told by their advisors that the Rigases' purchase of Adelphia securities in conjunction with an Adelphia public offering was crucial to the success of that offering.

99.     Accordingly, if Adelphia wanted to access funding from the public markets, the Rigases also had to agree to purchase Adelphia securities.

100.    An express purpose of both the 1996 and 1999 Co-Borrowing Agreements was to provide the Rigas Family with funds so that the Rigas Family could purchase additional Adelphia securities.

101.    Adelphia securities purchases were also made with funds drawn under the 2000 and 2001 Co-Borrowing Agreements.

102.    Deloitte was fully aware that RFPs used co-borrowed funds to purchase hundreds of millions of dollars in Adelphia securities between 1997 and 2001.

103.    Deloitte, which had committed itself to ensuring that related party transactions were properly accounted for and disclosed to the public, never advised that the use of co-borrowed funds raised any accounting or disclosure issues.

104.    At all relevant times, Deloitte concluded that the Managed Entities could repay their portion of the co-borrowed debt, including the debt that was used to purchase Adelphia securities.

105.    Viewing the Managed Entities' ability to repay as self-evident, Deloitte failed to create detailed workpapers on this subject, something that later would cause substantial harm to Plaintiffs.

### Deloitte Involvement in Other Significant Accounting Issues

106.    The concept of digital converter box venders providing funds to cable companies to advertise was a practice well-known in the cable industry and generally referred to as "marketing support" arrangements.

107.    Indeed, a member of the Deloitte engagement team attended a round table discussion among cable auditors discussing the topic.

108.    As Adelphia was one of the few cable companies not to have marketing support arrangements in place, in 2000, it was suggested that Adelphia should revise its agreements with its two main cable box vendors, Scientific Atlanta and Motorola, to include such arrangements.

109.    In so doing, the Rigases understood that Deloitte had signed off on the propriety of the arrangements.

110.    Although Deloitte's workpapers reflect that they were provided with the two agreements that together implemented the marketing support arrangement and understood the transactions, Deloitte subsequently disclaimed understanding of how the marketing support arrangement was structured.

111.    Deloitte also provided substantial advice regarding the management and other fees paid by the Managed Entities to Adelphia, and also with respect to the capitalization of labor.

## 2001 Audit

112.    In early 2002, the SEC announced new guidance regarding disclosures of off-balance sheet debt stemming from the Enron debacle.  Deloitte interpreted that guidance as now requiring that Adelphia disclose not just the existence of the co-borrowing facilities and the key terms of those agreements, including that either party can draw the entire amount and joint and several liability, but also the amount borrowed under those facilities by the Rigases that was not reflected on Adelphia's balance sheet, *i.e.*, the off-balance sheet debt.

113.    Notably, the amount of Rigas co-borrowed debt was already discernable from other public filings if anyone had been interested in the amount, but the new SEC guidance required an additional disclosure.

114.    As was its practice, Adelphia looked to Deloitte for instructions regarding compliance with SEC rules.   Indeed, Deloitte was always intimately involved with any interaction between Deloitte and the SEC such as responding to SEC comment letters.

115.    Consistently, Adelphia followed the instructions of the professionals at Deloitte without objection, and set in motion the process to disclose directly the amount of funds borrowed by the Rigas co-borrowers in the 2001 10K.

116.    Deloitte determined the manner in which the off-balance sheet debt was disclosed.

117.    During a February 28, 2002 audit committee meeting, Deloitte confirmed that the prior co-borrowing disclosure had not been insufficient but that a different disclosure was necessary because of the SEC's new guidance.

118.    Deloitte's presentation included a review of their 2001 audit, which they lauded as one of the best ever for Adelphia.  Their presentation also reflected significant direct

placements to the Rigases in 2001, several of which correspond directly to draws from co-borrowing facilities by Rigas entities.

119.   Deloitte representatives stated they "had a very good audit, that they were comfortable with this, and they were fine."

120.   Deloitte's workpapers reflect direct knowledge of the use of $145 million in co-borrowed funds by Highland Holdings to purchase Adelphia securities.

121.   Deloitte auditors acknowledged that, in February 2002, they learned that the consideration for the October 2001 direct placement of Adelphia securities to a Rigas affiliate was an assumption of $423 million in co-borrowed debt.   Deloitte considered whether any accounting issues were raised by this transaction and determined that they were not.

122.   Although Deloitte did not do a formal, written "ability to repay" analysis, Deloitte has admitted in prior testimony that such an analysis was performed and supported the Rigases' ability to repay at all relevant times.

123.   During an audit, Deloitte occasionally will issue a letter to the client, called a "management letter," that summarizes suggestions for improvements in internal controls or accounting functions that were noted or resulted from the audit.

124.   However, Deloitte **never** issued a management letter to Adelphia in connection with any of its Adelphia-related audits and was not contemplating doing so with respect to the 2001 audit as of March 26, 2002.

### The March 27th Conference Call

125.   As of March 27, 2002, Deloitte had verbally approved substantially the entire draft 2001 Adelphia 10-K for filing with the SEC in the next few days, and signed off on an earnings press release to be issued by Adelphia.   Deloitte's practice was not to sign off on such a

19

press release until it was confident that the audit was substantially complete.  In this instance, Deloitte was merely tying up a few inconsequential loose ends before issuing its formal audit opinion.

126.    After extensive review by Deloitte and its outside counsel and concurrence as to the substance of the release, Adelphia issued an earnings report and held a conference call with analysts to discuss the earnings results.  Among other things, the earnings release disclosed the amount that the Rigas co-borrowers had borrowed pursuant to the co-borrowing agreements.

127.    Adelphia would not have issued the press release if Deloitte had not authorized them to do so.

128.    Following the conference call, issues arose in the marketplace regarding the amount of Rigas co-borrowers' debt.

129.    Within a matter of days, the SEC began investigating Adelphia's accounting treatment and disclosure of the co-borrowing agreements.

130.    The Rigases and Adelphia turned to Deloitte for assistance with responding to the SEC, as only Deloitte had the information necessary to defend its accounting determinations. Deloitte spent much time educating and preparing Timothy Rigas to attend a meeting with the SEC in mid-May 2002.

131.    After it was clear that the SEC had a fundamental disagreement regarding how the co-borrowing agreements should have been accounted for, rather than stand by its accounting decisions and the advice consistently rendered to the Rigases, Adelphia, and the Managed Entities, Deloitte took steps to distance itself from the controversy surrounding the disclosure regarding the co-borrowing debt – an issue in which neither the Rigases, Adelphia nor the

Managed Entities had any say but which had been dictated by Deloitte's most highly-regarded technical accountant and its engagement team and affirmed time and again.

132.    Deloitte's treason against the Rigases, Adelphia, the Managed Entities, and all other related parties began when its National Office supplanted the engagement team that had previously provided advice to Adelphia and Plaintiffs.

133.    Deloitte then requested to be provided with documentation that had already been reviewed by the engagement team and contrived request lists as a means to delay signing the audit opinion for the financial statements that it previously verbally approved.

134.    Ultimately, Deloitte refused to sign the audit opinion unless and until the SEC concurred with its accounting decisions.  At no time prior did Deloitte ever suggest that its agreement to audit Adelphia would be conditioned upon prior concurrence by the SEC with Deloitte's professional judgments.

135.    By so refusing, Deloitte sought to minimize its exposure to criticism by the government by abandoning its professional responsibilities to its clients to complete the Adelphia audit.

136.    In light of the collapse of Arthur, Anderson, Deloitte put its self-interests ahead of its clients' despite knowing that completion of the audit was crucial to the very survival of Adelphia, the Managed Entities, and the RFPs, and would destroy the financial well-being of the Rigas Family who had ownership interests in such entities.

137.    Deloitte's refusal to complete the 2001 audit was wrongful and was intended to place Deloitte's self- interests above the best interests of its clients.

138.    The consequences of Deloitte's refusal to complete the 2001 audit were dramatic. Without audited financial statements, Adelphia was unable to issue its 2001 10-K, which

ultimately led to, *inter alia*, defaults under various agreements, a severe diminution of the value of Adelphia's shares, and Adelphia's shares being delisted by NASDAQ in June of 2002.

139.    The decimation of Adelphia had catastrophic effects on the Managed Entities, which were co-borrowers with Adelphia and, in some cases, had lent funds to the RFPs to purchase Adelphia securities, which were severely devalued as a result of Deloitte's actions.

140.    Thus, the value of each of the three main assets owned by the Rigas Family, *i.e.*, Adelphia securities, the Managed Entities and the RFPs, dropped substantially as a direct and foreseeable result of Deloitte's actions.

141.    On June 25, 2002, Adelphia and 227 of its subsidiaries filed a voluntary petition for relief under Chapter 11 of Title 11 of the United States Code.

142.    Deloitte's refusal to sign its audit report on the 2001 financial statements was the proximate cause of harm to the Plaintiffs.

143.    Deloitte's conduct further had the effect of undermining the Rigases' credibility both at Adelphia, with the government, and in the public as a whole.

144.    In distancing itself from Adelphia and the Rigases, Deloitte gave the false impression that it had been defrauded by Adelphia and the Rigases regarding key issues such as those involving the co-borrowing agreements and related party transactions.

**Deloitte's Refusal to Cooperate with the Rigases and Criminal Charges**

145.    On July 24, 2002, John Rigas and Timothy Rigas were arrested, the Securities and Exchange Commission filed an action against the Rigases and Adelphia ("the SEC action"), and Adelphia filed a civil action against the Rigases, the Managed Entities and certain RFPs ("the Adelphia action").

146.    On September 22, 2002, John Rigas and Timothy Rigas were indicted on federal conspiracy, securities fraud, bank fraud and wire fraud charges.

147.    The vast majority of the charges in the indictment relate to accounting and disclosure decisions dictated and/or approved by Deloitte upon whom the Rigases relied. Specifically, the government's case at trial challenged netting, affiliate loans, the co-borrowing arrangements, Rigas purchases of Adelphia securities, marketing support, and other practices in which Deloitte was significantly involved.

148.    During the criminal proceedings against John and Timothy Rigas, James Brown ("Brown"), the government's star witness and centerpiece of its case against the Rigases, gave false and misleading testimony covering a panoply of the most important subject areas, including what matters were disclosed to and approved by Deloitte.

149.    Brown's testimony was carefully calculated to create the misimpression that the Rigases were deceitful people who took repeated actions to fool a variety of people, particularly Deloitte.  In fact, Brown's direct and redirect testimony used the expression "fool the auditors" (or a substantially similar phrase) no fewer than 13 times. Such a portrait permitted the prosecution to refute one of the Rigases' primary defenses: that the alleged fraudulent conduct had been reviewed and approved by Deloitte and that the Rigases properly relied on expert advice as to critical accounting and disclosure issues.

150.    But the testimony was not true, and in a January 23, 2006 SEC hearing, Brown presented an entirely different view of his candor towards Deloitte. Gone were his prior allegations of rampant and insidious deception at Adelphia.  In fact, throughout the hearing, Brown repeatedly denied lying about any of the major accounting matters at issue in the criminal

trial, including co-borrowing, netting, the cash management system, debt reclassification, and direct stock placements.

151.   The truth was that Deloitte was never "fooled" by Brown and, in fact, discounted his positions knowing that he had no public accounting experience, and that he frequently appeared to misunderstand financial reporting issues.   Of course, since Deloitte had determined that Adelphia was a high risk client and made every significant accounting determination, and even some insignificant ones, Deloitte had no reason to rely upon Brown's opinions or work product.   As long as Adelphia maintained accurate books and records for Adelphia and the Managed Entities, which it did, Deloitte was able to, and did, independently verify the propriety of all Adelphia transactions and accounting determinations.

152.   In 1997, Deloitte even internally suggested that Brown should not be functioning as a chief financial officer of a public company.   That concern, however, was not communicated to the Rigases or the audit committee at Adelphia.

153.   Deloitte refused interviews, and its silence permitted Brown to perjure himself without challenge.   In the absence of Deloitte's cooperation, John and Timothy Rigas were unable to present a defense because Deloitte had first-hand knowledge regarding the motivation behind how transactions were accounted for at Adelphia.   John and Timothy Rigas called no substantive witnesses at the criminal trial.

154.   Based on Brown's false testimony and the inability to call Deloitte witnesses, in July 2004, John Rigas and Timothy Rigas were convicted of conspiracy, securities fraud and bank fraud but acquitted of wire fraud charges.   To the extent the verdicts against John or Timothy Rigas were premised on accounting and disclosure decisions approved by Deloitte, the

Rigases had relied upon Deloitte's audits and professional judgments and the advice Deloitte provided to Adelphia.

155.    John and Timothy Rigas continue to fight their convictions through a pending habeas petition that raises issues of government misconduct.

### Global Settlement

156.    The Rigases and the Managed Entities have spent millions of dollars thus far to defend against the criminal and civil actions that were a direct result of Deloitte's improper conduct.

157.    After obtaining convictions only against John and Timothy Rigas, who were minority owners of the Managed Entities and certain RFPs, the government was unable to obtain forfeiture of such entities without additional proceedings against the other members of the Rigas family.

158.    The Rigas Family ultimately agreed to enter into a global settlement agreement among the government, Adelphia and the Rigas Family.  As a result of this settlement, John Rigas was forced to forfeit or transfer to other family members substantially all of his assets. This included all of his interests in Adelphia, the Managed Entities and other RFPs, in addition to his non-business assets.

159.    Plaintiff James Rigas also gave up all of his interests in Adelphia and most of his interests in the Managed Entities and other RFPs.

160.    Most of the RFPs, including the Plaintiffs in this case, were also forfeited to the Government.

161.    Prior to the forfeiture of Highland Holdings, Highland Preferred, Highland Prestige, Highland Video and Hilton Head to the United States, and on or about June 3, 2005, the

entities entered into individual General Assignments of Assets whereby all assets not retained by the entities in order to comply with the Government-Rigas Settlement Agreement were distributed to John Rigas, Michael Rigas, Timothy Rigas, James Rigas, and Ellen Rigas Venetis, including the entities' interests in claims against Deloitte. (*See, e.g.,* General Assignment of Assets by Highland Holdings (June 3, 2005), attached hereto as Exhibit "A").[4]

162.    Subsequently, on the same day, John Rigas, Michael Rigas, Timothy Rigas, James Rigas, and Ellen Rigas Venetis transferred and assigned the assets and rights received from the entities to Zito I pursuant to an agreement of Contribution and Assignment. (*See, e.g.,* Contribution and Assignment (June 3, 2005), attached hereto as Exhibit "B").

163.    The United States consented to the transfer of assets, including the entities' litigation rights against Deloitte, during the course of negotiations leading to the Government-Rigas Settlement Agreement.

164.    Coudersport was excluded from the Managed Entities that were forfeited but subsequently became Zito Media.

165.    Because of its misconduct, Deloitte has had to pay well over $400 million to settle claims against it.

## COUNT I
## BREACH OF CONTRACT
## Plaintiffs v. Deloitte

166.    Plaintiffs incorporate by reference paragraphs 1 through 164 as though set forth in full herein.

---

[4] The General Assignment of Assets of Highland Holdings is attached hereto as a representative sample of the assignments entered into by each of Highland Holdings, Highland Preferred, Highland Prestige, Highland Video and Hilton Head. Due to the passage of time, Plaintiffs have been unable to locate copies of the Assignments executed by Highland Preferred, Highland Prestige, Highland Video and Hilton Head.  If necessary, counsel and representatives of Plaintiff can attest to the Government's agreement to permit such pre-forfeiture transfer and that the parties entered into agreements similar to the Highland Holdings agreement.

167.    John Rigas first entered into a contract with Deloitte in 1982 for Deloitte to provide consulting and accounting services to him and companies owned wholly or partially by him.

168.    This contractual relationship continued through the Spring of 2002 and expanded to include accounting, auditing, SEC disclosures and estate planning advice.

169.    During that time, Deloitte, *inter alia*, repeatedly agreed to review and analyze all related party transactions involving John Rigas and his personally held assets, including the Managed Entities and RFPs, and Adelphia and to ensure that such transactions were appropriately accounted for and disclosed.  Deloitte further agreed to identify deficiencies and risks associated with such transactions.

170.    Deloitte similarly entered into a direct client relationship with James Rigas in or about 1986.  As with John Rigas, James expressly relied upon Deloitte's agreement to review and analyze all related party transactions involving John Rigas and his personally held assets, including the Managed Entities and RFPs, and Adelphia, and to ensure that such transactions were appropriately accounted for and disclosed.  Deloitte further agreed to identify deficiencies and risks associated with such transactions.

171.    The Managed Entities were also parties to direct contracts with Deloitte for the provision of accounting and auditing services.  With respect to the Managed Entities, Deloitte agreed to review and analyze all related party transactions involving John Rigas and his personally held assets, including the Managed Entities and RFPs, and Adelphia, and to ensure that such transactions were appropriately accounted for and disclosed.  Deloitte further agreed to identify deficiencies and risks associated with such transactions.

172.    At all relevant times hereto, Deloitte counseled that the Rigases and their related entities, including the Managed Entities and the RFPS, should be considered as one entity.

173.    Consistently, all Rigas-related entities, including Plaintiffs, were either express parties to the contracts formed by any of the other entities or were express third party beneficiaries of such contracts.

174.    Plaintiffs were also either direct clients of Deloitte by virtue of their affiliation with Adelphia or express third party beneficiaries of the contract between Adelphia and Deloitte.

175.    Implicit and/or explicit in such agreements was that Deloitte would stand behind its advice with respect to related party transactions if such transactions were ever challenged.

176.    Deloitte breached its agreements with Plaintiffs by failing to advise them that the method by which certain related party transactions were recorded, structured, accounted for and disclosed could be viewed as inappropriate, let alone fraudulent or criminal, and by failing to cooperate with them with respect to the defense of such transactions.

177.    As a result of Deloitte's failure to advise Plaintiffs of the risks associated with related party transactions with Adelphia, they entered into significant related party transactions, which were subsequently challenged by numerous parties, including the government, as inappropriate, fraudulent and/or criminal.

178.    Moreover, despite serious concerns regarding Brown and certain practices in which he was engaged, Deloitte never raised those concerns with Plaintiffs, Adelphia, or its audit committee, as it had repeatedly agreed to do.

179.    Deloitte's failure to alert Plaintiffs and Adelphia to such concerns was a breach of the contracts among the parties.

180.    Deloitte promised that the 2001 audit was essentially complete and that it would issue a clean audit report within days.

181.    Based on his representation, Adelphia issued a press release announcing its earnings.

182.    Despite this representation and other assurances in March, 2002 that there were no significant issues with the proposed Adelphia 10-K for 2001, Deloitte subsequently refused to sign off on the 10-K after the March 27, 2002 conference call.

183.    Instead, Deloitte took steps to distance itself from the controversy surrounding the disclosure regarding the co-borrowing debt and refused to sign its audit report.

184.    Deloitte's refusal to sign off on the 2001 audit was wrongful, without justification and in violation of the legal duties owed to Plaintiffs.

185.    Without audited financial statements, Adelphia was unable to issue its 2001 10-K, which ultimately led to, *inter alia*, defaults under various agreements, a severe diminution of the value of Adelphia's shares and to Adelphia's shares being delisted by NASDAQ in June of 2002.

186.    This, in turn, destroyed the value of the Managed Entities and RFPs, which, along with interests in Adelphia, were the main assets of John and James Rigas.

187.    As a result of Deloitte's failure to cooperate with Plaintiffs in defending its determinations regarding related party transactions, they had to incur millions of dollars in defense costs.

188.    In addition, Plaintiffs were forced to forfeit substantial assets as a result of Deloitte's breach of its contracts with them.

189.    John and James Rigas also suffered a loss of their positions as officers and directors of Adelphia as well as all compensation, emoluments, benefits and perquisites attendant

to these positions and they became subject to multiple multimillion dollar civil and criminal lawsuits.

**WHEREFORE**, Plaintiffs respectfully demand judgment in their favor and against Deloitte including an award of compensatory damages, prejudgment interest, costs, attorney's fees, and such other and further relief as this Court deems just and proper.

**COUNT II**
**BREACH OF PROFESSIONAL DUTY**
**Plaintiffs  v. Deloitte**

190.    Plaintiffs incorporate by reference paragraphs 1 through 164 as though set forth in full herein.

191.    Deloitte provides licensed accounting, auditing, and SEC disclosure services, among other services such as estate planning services.

192.    Deloitte and Plaintiffs were parties to contracts under which Deloitte was to provide advice on accounting, auditing, and SEC disclosure issues.

193.    Deloitte owed a duty of care to Plaintiffs with respect to consulting and accounting advice, including audits and reviews and other work performed by Deloitte as described herein.

194.    In addition, Plaintiffs were intended beneficiaries of the audit services performed by Deloitte for Adelphia.

195.    Moreover, a special relationship existed between Plaintiffs and Deloitte in light of, *inter alia*, the nature and term of the Rigases' positions with Adelphia, the inter-relationships between the Managed Entities, RFPs, and Adelphia, and Deloitte's role in performing auditing and other accounting services that affected all of the entities and the Rigases individually.

10747633_10

196.    Despite a heightened degree of risk associated with Adelphia, Deloitte failed to properly document significant accounting decisions and/or analyses, including the Rigases' ability to repay their co-borrowed debt.

197.    Deloitte had a duty to review and analyze all related party transactions involving Plaintiffs and to advise them of any potential deficiencies and/or risks associated with such transactions.

198.    Deloitte failed to exercise an appropriate standard of care, *inter alia*, by failing to disclose to Plaintiffs that related party transactions should be formally documented by contract, and by failing to advise Plaintiffs of the risk that Deloitte's accounting determinations with respect to related party transactions, including netting of affiliate receivables, the co-borrowing agreements and Rigas securities purchases, could be subject to challenge.

199.    In reliance on Deloitte's advice, Plaintiffs entered into a series of related party transactions, all the while believing that such transactions were being properly disclosed to the public and properly accounted for pursuant to Deloitte's advice.

200.    But for Deloitte's advice, Plaintiffs would not have entered into significant related party transactions that were subsequently challenged by the government and other civil litigants.

201.    Despite serious concerns regarding Brown and certain practices in which he was engaged, Deloitte never raised those concerns with Plaintiffs, Adelphia or its audit committee, as it had repeatedly agreed to do.

202.    Deloitte also owed a duty to alert the Plaintiffs and Adelphia to its concerns regarding Brown.

203.    By failing to do so, Deloitte breached its duty of care to Plaintiffs.

31

204.    Deloitte promised that the 2001 audit was essentially complete and that it would issue a clean audit report within days.

205.    Based on his representation, Adelphia issued a press release announcing its earnings.

206.    Despite this representation and other assurances in March 2002 that there were no significant issues with the proposed Adelphia 10-K for 2001, Deloitte subsequently refused to sign off on the 10-K after the March 27, 2002 conference call.

207.    Instead, Deloitte took steps to distance itself from the controversy surrounding the disclosure regarding the co-borrowing debt and refused to sign its audit report.

208.    Deloitte's refusal to sign off on the 2001 audit was wrongful, without justification and in violation of the legal duties owed to Plaintiffs.

209.    Without audited financial statements, Adelphia was unable to issue its 2001 10-K, which ultimately led to, *inter alia*, defaults under various agreements, a severe diminution of the value of Adelphia's shares and to Adelphia's shares being delisted by NASDAQ in June of 2002.

210.    This, in turn, destroyed the value of the Managed Entities and RFPs, which, along with interests in Adelphia, were the main assets of John and James Rigas.

211.    As a result of Deloitte's conduct, Plaintiffs also had to incur millions of dollars in defense costs.

212.    In addition, Plaintiffs were forced to forfeit substantial assets as a result of Deloitte's breach of its contracts with them.

213.    John and James Rigas also suffered a loss of their positions as officers and directors of Adelphia as well as all compensation, emoluments, benefits and perquisites attendant

to these positions, and they became subject to multiple multimillion dollar civil and criminal lawsuits.

214.    The harm incurred by Plaintiffs was foreseeable by Deloitte given its knowledge of Plaintiffs' relationship to Adelphia and the lawsuits and other legal actions which would and did arise as a result of Deloitte's wrongful conduct.

**WHEREFORE**, Plaintiffs respectfully demand judgment in their favor and against Deloitte including an award of compensatory damages, prejudgment interest, costs, attorney's fees, and such other and further relief as this Court deems just and proper.

### COUNT III
### NEGLIGENT MISREPRESENTATION
### All Plaintiffs v. Deloitte

215.    Plaintiffs incorporate by reference paragraphs 1 through 164 as though set forth in full herein.

216.    At all times relevant hereto, Deloitte represented that it had the technical expertise to provide accurate accounting, SEC disclosure, and other advice to Plaintiffs.

217.    As part of the services provided to Adelphia and to Plaintiffs, Deloitte reviewed and analyzed all related party transactions involving Plaintiffs.

218.    Deloitte represented to Plaintiffs that it would advise them of any potential deficiencies and/or risks associated with such transactions.

219.    Despite this representation, Deloitte failed to disclose to Plaintiffs that related party transactions should be formally documented by contract and  failed to advise Plaintiffs of the risk that Deloitte's accounting determinations with respect to related party transactions, including netting of affiliate receivables, the co-borrowing agreements and Rigas securities purchases, could be subject to challenge.

33

220. In reliance on Deloitte's representations, Plaintiffs entered into a series of related party transactions, all the while believing that such transactions were being properly disclosed to the public and properly accounted for pursuant to Deloitte's advice.

221. But for Deloitte's advice, Plaintiffs would not have entered into significant related party transactions that were subsequently challenged by the government and other civil litigants.

222. Deloitte knew Plaintiffs, as the recipients of such representations, would rely them.

223. Deloitte intended the representations to induce the Plaintiffs to act.

224. The Plaintiffs acted in justifiable reliance on Deloitte's misrepresentations.

225. Deloitte further represented to Plaintiffs that it would advise them of any concerns that it had with deficiencies it encountered in rendering its services.

226. Despite serious concerns regarding Brown and certain practices in which he was engaged, Deloitte never raised those concerns with Plaintiffs, Adelphia or its audit committee, as it had repeatedly agreed to do.

227. This conscious omission by Deloitte caused Plaintiffs harm.

228. Deloitte also promised that the 2001 audit was essentially complete and that it would issue a clean audit report within days.

229. Based on his representation, Adelphia issued a press release announcing its earnings.

230. Despite this representation and other assurances in March 2002 that there were no significant issues with the proposed Adelphia 10-K for 2001, Deloitte subsequently refused to sign off on the 10-K after the March 27, 2002 conference call.

231.    Instead, Deloitte took steps to distance itself from the controversy surrounding the disclosure regarding the co-borrowing debt and refused to sign its audit report.

232.    Deloitte's refusal to sign off on the 2001 audit was wrongful, without justification and in violation of the legal duties owed to Plaintiffs.

233.    Without audited financial statements, Adelphia was unable to issue its 2001 10-K, which ultimately led to, *inter alia*, defaults under various agreements, a severe diminution of the value of Adelphia's shares and to Adelphia's shares being delisted by NASDAQ in June of 2002.

234.    This, in turn, destroyed the value of the Managed Entities and RFPs, which, along with interests in Adelphia, were the main assets of John and James Rigas.

235.    As a result of Deloitte's conduct, Plaintiffs also had to incur millions of dollars in defense costs.

236.    In addition, Plaintiffs were forced to forfeit substantial assets as a result of Deloitte's breach of its contracts with them.

237.    John and James Rigas also suffered a loss of their positions as officers and directors of Adelphia, as well as all compensation, emoluments, benefits and perquisites attendant to these positions and they became subject to multiple multimillion dollar civil and criminal lawsuits.

238.    The harm incurred by Plaintiffs was foreseeable by Deloitte given its knowledge of Plaintiffs' relationship to Adelphia and the lawsuits and other legal actions which would and did arise as a result of Deloitte's wrongful conduct.

**WHEREFORE**, Plaintiffs respectfully demand judgment in their favor and against Deloitte including an award of compensatory damages, prejudgment interest, costs, attorney's fees, and such other and further relief as this Court deems just and proper.

## COUNT IV
## TORTIOUS INTERFERENCE
## All Plaintiffs v. Deloitte

239.   Plaintiffs incorporate by reference paragraphs 1 through 164 as though set forth in full herein.

240.   Plaintiffs were parties to significant contractual arrangements among themselves, the other RFPs, and/or Adelphia.

241.   The Managed Entities were also parties to contracts with various lenders.

242.   Deloitte was aware of the contractual relationships between Plaintiffs, the other RFPs, Adelphia, and/or various lenders.

243.   Deloitte's purposeful action in refusing to sign the 2001 audit report was specifically intended to elevate protection of Deloitte's self-interests over the interests of Plaintiffs, knowing that the failure to sign the audit report would result in numerous credit defaults by Adelphia and the Plaintiffs.

244.   These credit defaults ultimately caused the collapse of Adelphia, and with it a complete devaluing of Plaintiffs and/or their assets which were intertwined with the finances of Adelphia.

245.   Deloitte had no legitimate justification for abandoning its audit.

246.   Deloitte's refusal to sign off on the 2001 audit was wrongful, without justification and tortiously interfered with Plaintiffs' contractual arrangements.

247.   Without audited financial statements, Adelphia was unable to issue its 2001 10-K, which ultimately led to, *inter alia*, defaults under various agreements, a severe diminution of the value of Adelphia's shares and to Adelphia's shares being delisted by NASDAQ in June of 2002.

248.    This, in turn, destroyed the value of the Managed Entities and RFPs, which, along with interests in Adelphia, were the main assets of John and James Rigas.

249.    As a result of Deloitte's conduct, Plaintiffs had to incur millions of dollars in defense costs.

250.    In addition, Plaintiffs were forced to forfeit substantial assets as a result of Deloitte's breach of its contracts with them.

251.    John and James Rigas also suffered a loss of their positions as officers and directors of Adelphia, as well as all compensation, emoluments, benefits and perquisites attendant to these positions and they became subject to multiple multimillion dollar civil and criminal lawsuits.

252.    The harm incurred by Plaintiffs was foreseeable by Deloitte given its knowledge of Plaintiffs' relationship to Adelphia and the lawsuits and other legal actions which would and did arise as a result of Deloitte's wrongful conduct.

**WHEREFORE**, Plaintiffs respectfully demand judgment in their favor and against Deloitte including an award of compensatory damages, prejudgment interest, costs, attorney's fees, and such other and further relief as this Court deems just and proper.

**COUNT V**
**BREACH OF FIDUCIARY DUTY**
**John Rigas, James Rigas and the Managed Entities  v. Deloitte**

253.    Plaintiffs incorporate by reference paragraphs 1 through 164 as though set forth in full herein.

254.    As Deloitte was well aware, the Rigases lacked any experience in technical accounting rules or SEC disclosure issues.

255.    Before Adelphia even became a public company, Deloitte promised that it would take control and ensure that Adelphia abided by all rules for public companies, including financial and SEC disclosures.

256.    The other Adelphia employees also lacked any experience with technical accounting rules and, in fact, did not even have access to technical accounting literature to guide them.

257.    Given this lack of experience, Deloitte made every significant accounting decision for Adelphia; the Rigases and Adelphia had no ability to question such decisions given their lack of expertise.

258.    Adelphia, for itself and for the Managed Entities, acted in complete reliance on Deloitte for advice.

259.    Given their close relationship over the years and the millions of dollars paid to Deloitte, the Rigases justifiably believed that Deloitte would act in the best interests of the Managed Entities and the Rigases.

260.    At all times, Deloitte negligently or intentionally failed to act in good faith and solely for the benefit of the Managed Entities and the Rigases in all matters for which it was employed.

261.    Deloitte's failure to act solely for the Rigases' and Managed Entities' benefit caused them injury.

262.    Deloitte's refusal to sign off on the 2001 audit was wrongful, without justification and not in the best interests of the Rigases or the Managed Entities.

263.    Without audited financial statements, Adelphia was unable to issue its 2001 10-K, which ultimately led to, *inter alia*, defaults under various agreements, a severe diminution of the value of Adelphia's shares and to Adelphia's shares being delisted by NASDAQ in June of 2002.

264.    This, in turn, destroyed the value of the Managed Entities and RFPs, which, along with interests in Adelphia, were the main assets of John and James Rigas.

265.    As a result of Deloitte's conduct, the Rigases and Managed Entities had to incur millions of dollars in defense costs.

266.    In addition, they were forced to forfeit substantial assets as a result of Deloitte's breach of fiduciary duty.

267.    John and James Rigas also suffered a loss of their positions as officers and directors of Adelphia, as well as all compensation, emoluments, benefits and perquisites attendant to these positions and they became subject to multiple multimillion dollar civil and criminal lawsuits.

268.    The harm incurred was foreseeable by Deloitte given its knowledge of John and James Rigas' and the Managed Entities' relationship to Adelphia and the lawsuits and other legal actions which would and did arise as a result of Deloitte's wrongful conduct.

**WHEREFORE**, Plaintiffs respectfully demand judgment in their favor and against Deloitte including an award of compensatory damages, prejudgment interest, costs, attorney's fees, and such other and further relief as this Court deems just and proper.

### COUNT VI
### CONTRIBUTION/INDEMNITY
### All Plaintiffs v. Deloitte

269.    Plaintiffs incorporate by reference paragraphs 1 through 164 as though set forth in full herein.

270.   Plaintiffs have been sued in various lawsuits across the country in connection with alleged material misrepresentations contained in Adelphia financial statements and other allegedly improper disclosures.  Plaintiffs have also suffered loss to the value of their Adelphia securities holdings as a direct and proximate result of these allegedly improper disclosures.

271.   Plaintiffs have paid considerable amounts to settle such suits and Deloitte should be primarily responsible because Deloitte provided the accounting advice and approvals relating to the transactions in question and Plaintiffs reasonably relied on this advice and approvals to their detriment.

272.   Plaintiffs' liability would not have, at least in part, have arisen absent Deloitte's conduct.  Consequently, Deloitte is responsible in contribution to share the injuries or damages that Plaintiffs were obligated to pay in respect to settle claims against them.

**WHEREFORE**, Plaintiffs respectfully demand judgment in their favor and against Deloitte including an award of compensatory damages, prejudgment interest, costs, attorney's fees, and such other and further relief as this Court deems just and proper.

## JURY TRIAL DEMAND

Plaintiffs hereby request a jury on all appropriate issues.

Respectfully submitted,

*Christie Callahan Comerford*

Lawrence G. McMichael
Christie Callahan Comerford
DILWORTH PAXSON LLP
1500 Market Street
Suite 3500E
Philadelphia, PA 19102
(215) 575-7000
(215) 575-7200
Attorneys for Plaintiffs

Dated: June 6, 2013

40

# Exhibit A

## GENERAL ASSIGNMENT OF ASSETS

Intending to be legally bound, and in the course of resolving its affairs prior to the forfeiture of the interests of the Assignor (as defined herein) to the United States Government, Highland Holdings, a Pennsylvania general partnership (the "Assignor"), does hereby irrevocably assign, transfer, set over and convey to its partners, pro rata in accordance with their respective interests, any and all of its remaining assets of whatsoever kind and nature, whether personal, real or mixed, tangible or intangible, and wheresoever located, other than those assets that must be retained by the Assignor to comply with the Government-Rigas Settlement Agreement. Said assets assigned, transferred, set over and conveyed may include, but shall not be limited to:

1. Cash;

2. Loans and accounts receivable, other than intercompany loans to affiliates;

3. Stock and securities, other than stocks and securities of Adelphia or the Managed Entities or other interests in entities to be forfeited;

4. Equipment, vehicles, furniture and fixtures; and

5. Interests in claims for refund of overpaid taxes, if any, Federal, State or otherwise, security deposits, rebates and claims.

IN WITNESS WHEREOF, the Assignor has caused this Assignment to be signed this ___3___ day of June, 2005.

Highland Holdings, Assignor

BY: _Michael J. Rigas_
Michael Rigas

604891_1

ASSIGNMENT ACCEPTED:

_John Rigas_

_Michael Rigas_

_Timothy Rigas_

_James Rigas_

_Ellen Rigas Venetis_

604891_1

ASSIGNMENT ACCEPTED:

_____
John Rigas

_____
Michael Rigas

_____
Timothy Rigas

_____
James Rigas

_____
Ellen Rigas Venetis

604891_1

# Exhibit B

## CONTRIBUTION AND ASSIGNMENT

This Contribution and Assignment (this "Assignment") is made as of June 3 2005 by John Rigas, Michael Rigas, Timothy Rigas, James Rigas, and Ellen Rigas Venetis (Assignors) in favor of Zito I, L.P., a Delaware limited partnership.

Intending to be legally bound, and in the course of resolving its affairs prior to the forfeiture of the interest of Dorellenic, Dorellenic Cable Partners, Doris Holdings, L.P., Eleni Acquisitions, Inc., Highland Holdings, Highland Holdings II, Highland 2000 L.P., Highland 2000 LLC, Illiad Holdings, Inc. and NCAA Holdings, Inc. (entities) to the United States Government, the assignors have entered into a General Assignment of Assets with the entities whereby all assets not retained by the entities in order to comply with the Government-Rigas Settlement Agreement are distributed to the assignors. Assignors do hereby grant, sell, transfer, assign, deliver and convey unto Zito I, L.P. all of the right, title and interest in and to the assets the assignors receive from the entities pursuant to the General Assignment of Assets agreements.  Said assets assigned, transferred, set over and conveyed may include, but shall not be limited to:

1. Cash;

2. Loans and accounts receivable, other than intercompany loans to affiliates;

3. Stock and securities, other than stocks and securities of Adelphia or the Managed Entities or other interest in entities to be forfeited;

4. Equipment, vehicles, furniture and fixtures; and

5. Interest in claims for refund of overpaid taxes, if any, Federal, State or otherwise, security deposits, rebates and claims.

IN WITNESS WHEREOF,   the Assignors, have caused this Assignment to be signed this ___3___ day of June, 2005.

_____
John Rigas, Assignor

_____
Michael Rigas, Assignor

_____
Timothy Rigas, Assignor

_____
James Rigas, Assignor

_____
Ellen Rigas Venetis, Assignor

ASSIGNMENT ACCEPTED:

_____
Zito I, L.P.

IN WITNESS WHEREOF,   the Assignors, have caused this Assignment to be signed this ___3___ day of June, 2005.

_____
John Rigas, Assignor

_____
Michael Rigas, Assignor

_____
Timothy Rigas, Assignor

_____
James Rigas, Assignor

_____
Ellen Rigas Venetis, Assignor

ASSIGNMENT ACCEPTED:

_____
Zito I, L.P.

## CERTIFICATE OF SERVICE

I, Kristen L. Repyneck, hereby certify that on this 6th day of June, 2013 a true and correct copy of Plaintiffs' First Amended Complaint was filed with the Court via overnight delivery to the Office of the Clerk accompanied by email of the same. Notice of this filing and a copy of the same will be electronically mailed and delivered via UPS overnight to the following recipients:

> Timothy E. Hoeffner
> DLA Piper US LLP (NY)
> 1251 Avenue of the Americas
> New York, NY 10020
> timothy.hoeffner@dlapiper.com
>
> James E. Canning
> Cravath, Swaine & Moore LLP
> 825 Eighth Avenue
> New York, NY 10019
> jcanning@cravath.com
>
> Courtney Gilligan Saleski
> DLA Piper US LLP (Philadelphia)
> One Liberty Place, 1650 Market Street
> Suite 4900
> Philadelphia, PA 19103
> courtney.saleski@dlapiper.com

*Counsel for Defendant, Deloitte & Touche LLP*

Kristen L. Repyneck