**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| IN RE ADELPHIA COMMUNICATIONS CORPORATION SECURITIES AND DERIVATIVE LITIGATION | 03 MDL 1529 (JMF) |
| This Document Relates To: *Island Partners, et al. v. Deloitte & Touche LLP* (05-CV-2770) | |

## PLAINTIFFS' RESPONSE TO DELOITTE & TOUCHE LLP'S STATEMENT OF FACTS IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT

Plaintiffs James Rigas, Zito I, L.P., and Zito Media, L.P. respond to Deloitte & Touche LLP's ("Deloitte") Statement of Material Facts in support of its Motion for Summary Judgment as follows:

### A.   PARTIES AND RELEVANT THIRD PARTIES

1.      Plaintiff Zito Media, L.P. ("Zito Media") is a Delaware limited partnership with its principal place of business located in Coudersport, Pennsylvania.  Second Am. Compl. ¶ 3. Zito Media is a subsidiary of Zito I, L.P. ("Zito I") and asserts claims on behalf of Coudersport Television Cable Company ("Coudersport").  *Id.*

**RESPONSE:**  Admitted.

2.      Coudersport was formed in Pennsylvania in the 1950s and John Rigas was the sole owner.  *See* Rigas Family Ownership Chart, attached to the Declaration of Timothy Hoeffner ("Hoeffner Aff.") as Ex. A; Dep. Tr. J. Rigas, 3/7/14, at 26:3-8, attached to Hoeffner Aff. as Ex. P; Dep. Tr. T. Rigas, 2/28/14, 14:9-22, attached to Hoeffner Aff. as Ex. Q; Dep. Tr. M. Rigas, 2/17/14, at 92:2-5, attached to Hoeffner Aff. as Ex. R.

**RESPONSE:**  Admitted.

3.      John Rigas controlled the decision-making at Coudersport.  Ex. Q at 14:16-15:1.
He also helped to manage the operations of the company.  Ex. R at 93:16-21.

**RESPONSE:**  Admitted.  By way of further answer, John Rigas regularly consulted with his
sons and implemented their recommendations when making decisions related to Coudersport.
*See* Dep. Tr. J. Rigas, 3/7/14, at 26, attached to Hoeffner Aff. as Ex. P.  Moreover, according to
Michael Rigas, although John maintained a roll in operating Coudersport, Michael Rigas, along
with Adelphia employees Robert Wahl and Todd McManus, oversaw the management of
Coudersport.  *See* Plaintiffs' Counter-Statement of Facts ("CSOF"), at ¶97.

4.      Plaintiff Zito I is a Delaware limited partnership with its principal place of
business located in Coudersport, Pennsylvania.  Second Am. Compl. ¶ 2.  Zito I asserts claims on
behalf of Highland Holdings, G.P. ("Highland Holdings"), Highland Preferred Communications
2001, LLC ("Highland Preferred"), Highland Prestige Georgia, Inc. ("Highland Prestige"),
Highland Video Associates, L.P. ("Highland Video") and Hilton Head Communications, L.P.
("Hilton Head").  *Id.*

**RESPONSE:** Admitted.

5.      Highland Holdings is a general partnership that, as of 2002, was owned by John
Rigas, Michael Rigas, Timothy Rigas, James Rigas, and Ellen Rigas Venetis.  Second Am.
Compl. ¶ 2; Ex. A; Ex. R at 25:10-25:11.  John Rigas owned 1.818%; Michael Rigas owned
32.778%; Timothy Rigas owned 32.778%; James Rigas owned 28.094%; and Ellen Rigas
Venetis owned 4.533%.  *See* Ex. A.

**RESPONSE:** Admitted

6.      Highland Preferred is a Delaware limited liability company that was formed in
1999 as Highland Preferred Communications II, LLC.  *See* Highland Preferred Communications

II Certificate of Formation, attached to Hoeffner Aff. as Ex. B.  In 2001, Highland Preferred Communications II, LLC changed its name to Highland Preferred Communications 2001, LLC. *See id.*

**RESPONSE:**  Admitted.

7.     Highland Preferred is a wholly-owned subsidiary of Highland Holdings.  *See* Ex. A; *see also* Plaintiffs' Responses to Deloitte's Requests For Admissions, attached to Hoeffner Aff. as Ex. C, at 5.

**RESPONSE:**  Admitted.

8.     Highland Holdings and Highland Preferred were never parties to a contract with Deloitte and Deloitte was never engaged by Highland Holdings or Highland Preferred to provide services of any kind.  Ex. Q at 30:14-31:18.  Indeed, when asked to confirm that Deloitte was not engaged by Highland Holdings and Highland Preferred to provide services of any kind, Timothy Rigas replied with "[t]hat's correct."  *Id.*  Timothy Rigas explained that such a contract was not necessary because "there was no real audit requirement . . . so no one thought it was really necessary for Deloitte & Touche to . . . audit [them]."  *Id.* at 30:18-30:25.

**RESPONSE:**  Admitted in part; denied in part.  It is admitted that Highland Preferred was never party to a written contract with Deloitte and that Deloitte was never engaged by Highland Preferred to provide auditing services.  It is denied that Highland Holdings was never a party to written contract with Deloitte or audited by Deloitte.  [CSOF, ¶8.]  By way of further answer, in response to a question specifically about whether Highland Holdings and Highland Preferred were parties to the 2001 audit engagement letter, Tim Rigas testified that "no one thought it was really necessary for Deloitte & Touche to really audit that, because, de facto, where the money's going and coming – going out of, the co-borrowings to those entities to purchase stock, were

3

already audited, if you will by Deloitte & Touche and the co-borrowing entities."  Dep. Tr. T. Rigas, 2/28/14, 30:23-31:4, attached to Hoeffner Aff. as Ex. Q.   Accordingly, Deloitte's representation that Mr. Rigas testified that Deloitte was not engaged by Highland Holdings or Highland Preferred *to provide services of any kind* is a misrepresentation of his testimony and contrary to the facts.  By way of further answer, Deloitte understood that Adelphia, the Rigases and the Rigas Family Partnerships, including Highland Holdings and Highland Preferred, were inextricably intertwined given the multitude of related party transactions among them, and that they would rely upon the advice provided by Deloitte to the group, especially in terms of structuring, accounting for and disclosure of related party transactions among the group.  [CSOF, ¶¶19-21.]

9.     Highland Prestige was a Delaware corporation that was incorporated in 2000.  *See* Certificate of Incorporation of Highland Prestige Georgia, Inc., attached to Hoeffner Aff. as Ex. D.  Highland Prestige had five owners: John Rigas, James Rigas, Michael Rigas, Timothy Rigas, and Ellen Rigas Venetis.  *See* Ex. A; Ex. R at 76:2-76:18.  James, Michael, and Timothy Rigas each owned 25% of Highland Prestige.  *See id.*  John Rigas owned 20%.  *See id.*  Ellen Rigas Venetis owned 5%.  *See id.*

**RESPONSE:** Admitted.

10.     Highland Video was a Pennsylvania limited partnership owned by John, Timothy, and Michael Rigas, and Highland Holdings.  *See id.* at 80:8-81:9.  John Rigas owned 9.45% of Highland Video, while Michael and Timothy Rigas each owned 12.535%.  *See* Ex. A.  Highland Holdings owned the remaining 64.48%.  *See id.*

**RESPONSE:** Admitted.

11.     Hilton Head was a Delaware limited partnership of which Doris Holdings LP owned 99% and NCAA Holdings LP owned 1%.  *See* Ex. A; Ex. R at 83:18-24.  Doris Holdings LP and NCAA Holdings LP were partnerships owned by the Rigas Family.  *See* Ex. R at 84:6-8.

**RESPONSE:**  Admitted.

12.     The boards of directors for Highland Holdings, Highland Preferred, Highland Prestige, Highland Video, and Hilton Head consisted of John Rigas, Timothy Rigas, Michael Rigas, and James Rigas.  *See*  Ex. R at 77:12-15.  Colin Higgin, an attorney for Zito I, explained that John Rigas, Timothy Rigas, Michael Rigas, and James Rigas sat on the boards of directors of these entities because "that's how these entities were setup."  Dep. Tr. Higgin, 2/4/14, at 71:17-21, attached to Hoeffner Aff. as Ex. S.

**RESPONSE:**  Admitted.

13.     The entities on behalf of which Zito I and Zito Media have brought this lawsuit were parties to management agreements with Adelphia Communications Corporation ("Adelphia") under which Adelphia and Adelphia staff operated the entities.  *See* Ex. R at 93:9-13.

**RESPONSE:**  Admitted in part; denied in part.  It is denied that Highland Holdings and Highland Preferred had management agreements with Adelphia.  The remaining portion of this statement is admitted.

14.     The entities on behalf of which Zito I and Zito Media have brought this lawsuit is identified by name in the Superseding Indictment of John Rigas, Timothy Rigas, Michael Rigas, and Michael Mulcahey, and each served as an instrumentality of the criminal enterprise.  *See generally*, Superseding Indictment, *United States v. Rigas*, S1 02-cr-01236 (LBS) (S.D.N.Y. Sept. 23, 2006), attached to Hoeffner Aff. as Ex. E.

116669166_1

**RESPONSE:** Admitted in part; denied in part. It is admitted that the entities on behalf of which Zito I and Zito Media have brought this lawsuit are identified by name in the Superseding Indictment of John Rigas, Timothy Rigas, Michael Rigas, and Michael Mulcahey. Deloitte has offered no admissible evidence that any of these entities served as an instrumentality of the criminal enterprise and, indeed, no such evidence exists. The Superseding Indictment contain allegations, which are nothing more than classic hearsay.

15.     Plaintiff James Rigas is an individual residing in Coudersport, Pennsylvania, who was an executive and director of Adelphia from about 1986 through May 2002. Second Am. Compl. ¶¶ 1, 10; Dep. Tr. Jas. Rigas, 3/5/14, at 44:6-13, attached to Hoeffner Aff. as Ex. T.

**RESPONSE:** Admitted.

16.     James Rigas has not identified or otherwise described any contract under which he engaged Deloitte to provide services directly to him as an individual. *See* Ex. T at 116:2-20, 119:15-120:25. Indeed, James Rigas's interactions with Deloitte were "very limited" or "extremely limited." *See id.* at 31:19-32:5.

**RESPONSE:** Admitted in part; denied in part. It is admitted that James Rigas's direct interactions with Deloitte after the early 1990s were limited. By way of further answer, as explained in his Declaration, James Rigas was a party to an express contract with Deloitte. [CSOF, ¶¶16-23.]

17.     Defendant Deloitte is a limited liability partnership organized under the laws of the state of Delaware. Second Am. Compl. ¶ 4.

**RESPONSE:** Admitted.

18.     Adelphia was a public company over which the Rigas Family retained voting control by virtue of their ownership of Class B common stock.  *See id.* ¶¶ 28-29.

**RESPONSE:**  Admitted in part.  The Rigas Family retained voting control by virtue of their ownership of Class A and Class B shares of Adelphia common stock.

19.     Dismissed plaintiff John Rigas is an individual incarcerated at FCI-Allenwood.  *See* Ex. P at 116:18-24.  John Rigas has been incarcerated at FCI-Allenwood since late 2011 or early 2012.  *See id.* at 116:21-24.  Prior to his incarceration at FCI-Allenwood, he was incarcerated in Butner, North Carolina.  *See id.* at 116:25-117:16.

**RESPONSE:**  Admitted.  By way of further answer, John Rigas continues to fight his conviction and incarceration through a pending habeas petition that raises issues of government misconduct.

20.     Timothy Rigas is an individual incarcerated at FCI-Allenwood.  *See* Ex. Q at 177:25-178:3.  Timothy Rigas has been incarcerated at FCI-Allenwood since late 2011 or early 2012.  *See id.* at 178:4-8.  Prior to his incarceration at FCI-Allenwood, he was incarcerated in Butner, North Carolina.  *See id.* at 178:9-13.  He was incarcerated in Butner, North Carolina, for 51 months.  *See id.* at 178:9-21.

**RESPONSE:**  Admitted.  By way of further answer, Timothy Rigas continues to fight his conviction and incarceration through a pending habeas petition that raises issues of government misconduct.

21.     Michael Rigas is an individual residing in Coudersport, Pennsylvania.  *See* Ex. R at 8:14-15.

**RESPONSE:**  Admitted.

22.     Michael Mulcahey is an individual who was employed by Adelphia and Zito Media, and on occasion provides consulting services to Zito Media.  Dep. Tr. Mulcahey, 2/5/14, at 9:17-11:1, 20:12-21:2, attached to Hoeffner Aff. as Ex. U.

**RESPONSE:**  Admitted.

**B.     CRIMINAL AND CIVIL PROCEEDINGS**

23.     John Rigas, Timothy Rigas, Michael Rigas, and Michael Mulcahey were indicted for violations of the federal securities laws.  *See* Ex. E.

**RESPONSE:**  Admitted.

24.     In July 2002, Adelphia commenced an action in the Bankruptcy Court against the Rigas Family and certain entities owned by the Rigas Family alleging, *inter alia*, violations of RICO, securities fraud, breach of fiduciary duty, and breach of contract.  *See* Government-Rigas Settlement Agreement, attached to Hoeffner Aff. as Ex. F, at 2.

**RESPONSE:**  Admitted.

25.     In July 2002, the Securities and Exchange Commission ("SEC") commenced a civil enforcement proceeding against Adelphia, John Rigas, Timothy Rigas, Michael Rigas, James Rigas, James Brown, and Michael Mulcahey.  *See* Complaint, *S.E.C. v. Adelphia Comm. Corp.*, 02-cv-05776 (S.D.N.Y. July 24, 2002), attached to Hoeffner Aff. as Exhibit G.

**RESPONSE:**  Admitted.

26.     John Rigas was convicted in 2004 of fifteen counts of securities fraud, two counts of bank fraud, conspiracy to commit securities fraud, conspiracy to commit bank fraud, conspiracy to make and cause to be made false and misleading statements in filings with the SEC, and conspiracy for the falsification of books and records of a public corporation.  *See*

Special Verdict Form, attached to Hoeffner Aff. as Ex. H; Ex. P at 117:20-118:16.  One count of

bank fraud was reversed on appeal.  *U.S. v. Rigas*, 490 F.3d 208, 239 (2d Cir. 2007).

**RESPONSE:**    Admitted.   By  way  of  further  answer,  John  Rigas  continues  to  fight  his

conviction and incarceration through a pending habeas petition that raises issues of government

misconduct.

27.     Timothy Rigas also was convicted in 2004 of fifteen counts of securities fraud,

two  counts  of  bank  fraud,  conspiracy  to  commit  securities  fraud,  conspiracy  to  commit  bank

fraud,  conspiracy  to  make  and  cause  to  be  made  false  and  misleading  statements  in  filings  with

the SEC, and conspiracy for the falsification of books and records of a public corporation.  *See*

Ex. H; Ex. Q at 185:14-188:14.  One count of bank fraud was reversed on appeal.  *U.S. v. Rigas*,

490 F.3d 208, 239 (2d Cir. 2007); Ex. Q 188:12-24.

**RESPONSE:**    Admitted.    By  way  of  further  answer,  Timothy  Rigas  continues  to  fight  his

conviction and incarceration through a pending habeas petition that raises issues of government

misconduct.

28.     Michael Rigas pled guilty to making a false entry in a record in November 2005.

*See* Michael Rigas's Plea Hearing Transcript, at 2:10-21, 18:6-19:25, attached to Hoeffner Aff.

as Ex. I.

**RESPONSE:**  Admitted.  By way of further response, the basis for this plea was that Michael

Rigas placed his signature on an SEC form 13(d) certifying that he had conducted a reasonable

inquiry regarding the accuracy of the information set forth in the form, when in fact, he had not

conducted such an inquiry.  *See* Michael Rigas's Plea Hearing Transcript, at 18:6-18:24, attached

to Hoeffner Aff. as Ex. I.

29.     In November 2006, Judge Castel of the U.S. District Court for the Southern District of New York found Michael Mulcahey had violated federal securities law.  *See* Findings of Fact and Conclusions of Law, *S.E.C. v. Adelphia Comm. Corp.*, 02-cv-05776 (S.D.N.Y. Nov. 16, 2006), attached to Hoeffner Aff. as J.

**RESPONSE:**  Admitted.  By way of further response, Judge Castel's decision has no evidentiary value in this case.

30.     In his Findings, Judge Castel wrote that, from 1998 through February 2002, "Mulcahey's false and fraudulent acts occurred repeatedly" at Adelphia.  Ex. J ¶ 95.  Such fraudulent acts included falsely signing management representation letters, falsely signing debt compliance certificates, and falsifying several documents in connection with a direct placement of securities with an entity owned by the Rigas Family.  *Id.*

**RESPONSE:**  Admitted.  By way of further answer, Judge Castel's decision has no evidentiary value in this case.

31.     Indeed, Judge Castel explained that Mulcahey's falsification of documents provided to Deloitte "was an attempt . . . to continue the deception of Deloitte."  *Id.* ¶ 71.  Judge Castel further found that "Mulcahey's false statements and omissions to . . . Deloitte . . . were material."  *Id.* ¶ 76.  In addition, "Mulcahey's intentional delivery of the phony Borrowing Notice and Paydown Notice to Deloitte was part of an ongoing fraudulent scheme, participated in by Mulcahey and others to hide from . . . Deloitte" Adelphia's false reporting of the October 2001 Direct Placement.  *Id.* ¶ 78.

**RESPONSE:**  Admitted.  By way of further answer, Judge Castel's decision has no evidentiary value in this case.

32.     Finally, Judge Castel found that Mulcahey falsely assured Deloitte that the "financial information" contained in eight management representation letters that were delivered to Deloitte was "fairly presented in conformity with [GAAP]." *Id.* ¶¶ 86, 89, 91, 92.

**RESPONSE:**  Admitted.  By way of further answer, Judge Castel's decision has no evidentiary value in this case.

## C.     THE GLOBAL SETTLEMENT

33.     In December 2004, the Government filed an Application for Preliminary Orders of Forfeiture against John and Timothy Rigas.  *See* Government-Rigas Settlement Agreement at p. 2, attached to Hoeffner Aff. at Ex. F.

**RESPONSE:**  Admitted.

34.     In order to settle and resolve all of the outstanding proceedings among the Rigas Family, the Government, the SEC, and Adelphia, various settlement agreements were executed in April 2005, one of which was a settlement agreement between the Government and the Rigas Family ("Government-Rigas Settlement Agreement").  *See generally* Ex. F at pp. 1-3.

**RESPONSE:**  Admitted.

35.     On May 31, 2005, John Rigas, Timothy Rigas, Michael Rigas, and James Rigas settled with the SEC.  *See* Ex. F at p. 3; Ex. T at 88:23-89:5; *S.E.C. v. Adelphia Comm. Corp.*, 02-cv-05776, Doc. Nos. 55-58 (S.D.N.Y. May 31, 2005).

**RESPONSE:**  Admitted.

36.     Pursuant to the Government-Rigas Settlement Agreement, "each person or entity included in the Rigas Family consent[ed] to the forfeiture to the United States . . . of all of their respective interests in the Forfeited Managed Entities and the Other Forfeited Entities . . . ."  Ex. F ¶ 1.

**RESPONSE:**  Admitted.

37.     The Rigas Family, as the term is used in the Government-Rigas Settlement Agreement, includes, *inter alia*, John Rigas, Timothy Rigas, Michael Rigas, John Rigas, Highland Holdings, Highland Preferred, Highland Prestige, Highland Video, Hilton Head, and Coudersport.  *See* Ex. F at "Exhibit A."

**RESPONSE:**  Admitted.

38.     The Forfeited Managed Entities and Other Forfeited Entities, as the term is used in the Government-Rigas Settlement Agreement, includes, *inter alia*, Highland Holdings, Highland Prestige, Highland Video, Hilton Head.  *See* Ex. F at "Exhibit C."

**RESPONSE:**  Admitted.

39.     Paragraph 7 of the Government-Rigas Settlement Agreement provides that Bucktail Broadcasting Corporation "shall be transferred to, or for the benefit of, members of the Rigas Family other than John J. Rigas or Timothy J. Rigas, prior to the entry of the Forfeiture Order."  Ex. F ¶ 7.

**RESPONSE:**  Admitted.

40.     "Exhibit C" of the Government-Rigas Settlement Agreement also plainly states that Highland Video, which is a Forfeited Managed Entity and owned part of Bucktail Broadcasting Corp., would not forfeit its ownership interest in Bucktail Broadcasting Corp. to the United States.  Ex. F at "Exhibit C."  Instead, the Government-Rigas Settlement Agreement provides that Highland Video's ownership interest would be transferred to an entity for the benefit of the Rigas Family, other than John and Timothy Rigas.  *Id.*

**RESPONSE:**  Admitted.

41.     In addition, "Exhibit B" to the Government-Rigas Settlement Agreement, which is entitled "MANAGED ENTITIES," includes Bucktail Broadcasting Corp. and Coudersport, but indicates that those entities are not included in the Forfeited Managed Entities that are listed on Exhibit C.  Ex. F at "Exhibit B."

**RESPONSE:**  Admitted.

42.     No similar carve-out exists for any other asset of Highland Video or any of the assets of Highland Holdings, Highland Preferred, Highland Prestige, or Hilton Head.  *See generally* Ex. F.

**RESPONSE:**  Admitted in part; denied as stated in part.  It is admitted that the only cable companies that are identified as not being included among the Forfeited Managed Entities are Bucktail Broadcasting Corp. and Coudersport.   The term "carve-out" is vague and ambiguous and incapable of a response as phrased and is, therefore, denied as stated.

43.     The  Government-Rigas  Settlement  Agreement  also  contains  a  complete integration clause: "This Agreement constitutes the entire agreement of the parties with respect to the subject matter hereof.  This Agreement shall not be modified, supplemented, amended or otherwise changed, or any of its provisions waived, in any matter whatsoever except by written instrument signed by the Parties."  Ex. F ¶ 17.

**RESPONSE:**  Admitted in part; denied as stated in part.  It is admitted that paragraph 17 contains what is commonly referred to as an "integration clause."   The phrase "complete integration clause" is vague and ambiguous and incapable of a response as phrased and is, therefore, denied as stated.

44.     The contemporaneously executed Adelphia-Rigas Settlement Agreement provides that "[f]rom the date hereof through the date the consent order of forfeiture is entered . . . the

Rigas Family shall with respect to the Forfeited Assets . . . maintain the Forfeited Assets in their current condition . . . ."  Adelphia-Rigas Settlement Agreement, attached to Hoeffner Aff. as Ex. K, ¶ 4.   The Forfeited Assets are the assets forfeited pursuant to the Government-Rigas Settlement Agreement.  *See id.* ¶ 1.

**RESPONSE:**  Admitted.  It is admitted that the Adelphia-Rigas Settlement Agreement provides that "[f]rom the date hereof through the date the consent order of forfeiture is entered . . . the Rigas Family shall with respect to the Forfeited Assets . . . maintain the Forfeited Assets in their current condition, ordinary wear and tear excepted; and direct Adelphia in its capacity as manager to operate the cable systems owned by the Forfeited Managed Entities in the ordinary course, consistent with past practices."   Adelphia-Rigas Settlement Agreement, attached to Hoeffner Aff. as Ex. K, ¶ 4.  It is further admitted that the Forfeited Assets are the assets forfeited pursuant to the Government-Rigas Settlement Agreement.  By way of further response, the litigation claims at issue in this case were not part of the Forfeited Assets.  [CSOF, ¶¶81-82.]

45.     Plaintiffs cannot identify any provision in the Government-Rigas Settlement Agreement that held back the entities' litigation rights and/or Highland Preferred from forfeiture. *See* Ex. R at 47:3-53:16; Ex. T at 96:3-97:22.

**RESPONSE:**  Admitted.  It is admitted that the Government-Rigas Settlement Agreement does not explicitly hold back the entities' litigation rights and/or Highland Preferred from forfeiture. By way of further answer, the Government-Rigas Settlement Agreement provides that "[t]he assets retained by the Rigas Family include but are not limited to Coudersport and Bucktail and the cable television franchise related to Coudersport and Bucktail . . ."  *Id.* at ¶ 3.  By way of further answer, the Adelphia-Rigas Settlement Agreement provides that "[f]rom the date hereof through the date the consent order of forfeiture is entered . . . the Rigas Family shall with respect

to the Forfeited Assets . . . maintain the Forfeited Assets in their current condition, ordinary wear and tear excepted; and direct Adelphia in its capacity as manager to operate the cable systems owned by the Forfeited Managed Entities in the ordinary course, consistent with past practices." *Id*. at ¶ 4.   By way of further answer, the United States consented to the transfer of assets, including the entities' litigation rights against Deloitte, during the course of negotiations leading to the Government-Rigas Settlement Agreement.  [CSOF, ¶¶79-83.]

46.     Plaintiffs cannot identify any written instrument signed by the parties to the Government-Rigas Settlement Agreement modifying or amending that agreement.  *See* Ex. R at 41:8-44:25; 49:16-50:19; 53:17-58:14; Ex. T at 99:7-20.

**RESPONSE:**  Admitted.  By way of further response, the parties to the Rigas-Government agreement agreed that the litigation rights against third parties would not be forfeited.  [CSOF, ¶¶79-83.]

47.     The forfeiture of the entities found in Exhibit C to the Government-Rigs Settlement Agreement was to be effectuated and was effectuated by a Consent Order of Forfeiture.  *See* Ex. F ¶ 1.

**RESPONSE:**  Admitted.

48.     The Consent Order of Forfeiture, which was filed on June 7, 2005, provided that the Forfeited Managed Entities and Other Forfeited Entities named in the Government-Rigas Settlement Agreement were "forfeited to the United States as property derived from and traceable to the offenses" for which certain Rigases had been convicted.  *See* Consent Order of Forfeiture, attached to Hoeffner Aff. as Ex. L, ¶ 1.

**RESPONSE:**  Admitted.

49.     Plaintiffs have produced only one document entitled General Assignment of Assets, in which Highland Holdings purported to transfer "any and all remaining interests" "other than those assets that must be retained by the Assignor to comply with the Government-Rigas settlement agreement" to the Rigas Family.  *See* General Assignment of Assets, attached to Hoeffner Aff. as Ex. M.  Plaintiffs have not produced any similar document for the remaining alleged predecessor entities, but instead claim that they "exist somewhere" and that plaintiffs have "been unable to locate them."  Ex. R at 55:7-18.

**RESPONSE:**  Admitted in part; denied as stated in part.  It is admitted that, pursuant to the General Assignment of Assets by Highland Holdings dated June 3, 2005, all assets not retained by Highland Holdings in order to comply with the Government-Rigas Settlement Agreement were distributed to John Rigas, Michael Rigas, Timothy Rigas, James Rigas, and Ellen Rigas Venetis, including Highland Holdings' claims against Deloitte.  Second Am. Compl. ¶ 175.  By way of further answer, the parties entered into substantially similar Assignments with respect to Highland Preferred, Highland Prestige, Highland Video and Hilton Head, copies of which Plaintiffs have been unable to locate due to the passage of time.  *Id*. at 175, n.4.  It is denied that the transfers were "purported."

**D.      DELOITTE'S ENGAGEMENT WITH ADELPHIA AND CERTAIN ENTITIES OWNED BY THE RIGAS FAMILY**

50.     Deloitte was engaged by Adelphia and certain entities owned by the Rigas Family to conduct quarterly reviews and annual audits of financial statements.  *See generally* Engagement Letters dated Oct. 25, 2000 and Nov. 5, 2001, attached to Hoeffner Aff. as Exs. N and O, respectively.

**RESPONSE:**  Admitted.

51.     During the course of the 2001 audit, Deloitte encountered several issues surrounding the documentation provided by Adelphia to support is financial statements, as well as certain statements or actions that Deloitte believed were misrepresentations or illegalities.  *See* Dep. Tr. Caswell, 3/7/14, attached to Hoeffner Aff. as Ex. W, at 96:3-101:7; Dep. Tr. Coulter, 3/6/14, attached to Hoeffner Aff. as Ex. V, at 131:11-132:16.

**RESPONSE:**   Denied.  By way of further answer, as of March 27, 2002, Deloitte had verbally approved substantially the entire draft 2001 Adelphia 10-K for filing with the SEC, and reviewed and signed off on an earnings press release issued by Adelphia, which disclosed, *inter alia*, the amount that the Rigas co-borrowers had borrowed pursuant to the co-borrowing agreements. [CSOF, ¶¶39-41.]   Following March 27, 2002, Deloitte chose to "re-start" the audit from scratch and never did complete the audit.  It is expressly denied that there is any evidence that this decision by Deloitte had anything to do with any misrepresentations or illegalities.  Instead, Deloitte's conduct post-March 27, 2002 was motivated by their desire to protect itself from litigation.  [CSOF, ¶ 59.]

52.     On May 14, 2002, Deloitte suspended its audit of the 2001 financial statements. *See* Ex. V at 147:9-148:3.

**RESPONSE:**  Admitted.

53.     In June 2002, Adelphia terminated Deloitte as its independent auditor.  *See* Ex. V at 157:24-158:2; Ex. W at 13:17-20.

**RESPONSE:**  Admitted.

## E.     PLAINTIFFS SEEK DAMAGES FROM DELOITTE

54.     Plaintiffs' Second Amended Complaint alleges that Deloitte breached certain contracts with plaintiffs; that Deloitte breached its professional duties to plaintiffs; and that

Deloitte is liable to plaintiffs for negligent misrepresentation.  *See* Second Am. Compl. ¶¶ 180-194, 200-218, and 225-242.

**RESPONSE:**  Admitted.

55.   The corporate representative of Zito I and Zito Media, when asked what damages the plaintiffs seek, stated "I mean, obviously, we would look to recover at least some of those assets that were [forfeited]."  Ex. R at 153:15-154:21.

**RESPONSE:** It is admitted that the corporate representative of Zito I and Zito Media, when asked what damages the plaintiffs seek, stated "I mean, obviously, we would look to recover at least some of those assets that were lost."  Dep. Tr. M. Rigas, 2/17/14, at 153:19-21, attached to Hoeffner Aff. as Ex. R.  By way of further answer, the corporate representative went on to state that, "The other managed entities, we lost subscribers, which made it much more difficult to operate cable – Coudersport Cable.  [We] had fewer buying discounts, less bargaining leverage when it came to equipment and programming.  Some of the economies of scale that would have been there were gone.  The ability to, you know, raise financing, leverage the assets, cash flow, certainly, that was greatly diminished.  So, certainly, all those things were lost . . . We had to spend millions of dollars on defense cost."  [CSOF, ¶98.]   By way of further response, Plaintiffs' damages will be the subject of expert testimony.

56.   James Rigas, when asked to identify what harm he suffered, explained that "before the events of 2002 I had either directly or indirectly ownerships in a number of assets and securities and the value of those assets and securities were significantly diminished in my mind as a result of Deloitte's actions and eventually led to the events where I had to forfeit most of those assets."  Ex. T at 70:21-71:9.

**RESPONSE:** Admitted.  By way of further answer, as a result of Deloitte's conduct, James Rigas also suffered a loss of his position as an officer and director of Adelphia as well as all compensation, emoluments, benefits and perquisites attendant to these positions, and became subject to multiple multimillion dollar civil and criminal lawsuits.  Second Am. Compl. ¶ 199. By way of further response, Plaintiffs' damages will be the subject of expert testimony.

57.     James Rigas also indicated that he seeks damages relating to his loss of his employment.  *See id.* at 104:7-18.  He stated that "I don't know that's where I see the majority of the damage being but I do think that our resignations would not have occurred if Deloitte had done what it should have done.  I do think there was damage caused by that."  *Id.* at 104:12-18.

**RESPONSE:**  Admitted.  By way of further response, as a result of Deloitte's conduct, James Rigas became subject to multiple multimillion dollar civil and criminal lawsuits.  Second Am. Compl. ¶ 199.  By way of further response, Plaintiffs' damages will be the subject of expert testimony.

                                        Respectfully submitted,

                                        /s/ Christie Callahan Comerford
                                        Lawrence G. McMichael
                                        Christie Callahan Comerford
                                        DILWORTH PAXSON LLP
                                        1500 Market Street
                                        Suite 3500E
                                        Philadelphia, PA 19102
                                        (215) 575-7000
                                        (215) 575-7200
                                        Attorneys for Plaintiffs

Dated: April 28, 2014
        Philadelphia, Pa.

**CERTIFICATE OF SERVICE**

I, Christie C. Comerford, hereby certify that on this 28th day of April, 2014, I caused a true and correct copy of the Plaintiffs' Response to Deloitte's Statement of Facts In Support of Its Motion for Summary Judgment to be filed through the Court's ECF system, which will cause notice of its filing to be served electronically upon all counsel who have appeared in this action.


        /s/ Christie Callahan Comerford
DATED: April 28, 2014        Christie Callahan Comerford

20