USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:
DATE FILED: 12/10/2014

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---------------------------------------------------------------------- X

IN RE ADELPHIA COMMUNICATIONS CORPORATION SECURITIES AND DERIVATIVE LITIGATION

---------------------------------------------------------------------- X

03-MD-1529 (JMF)

THIS DOCUMENT RELATES TO:

*Island Partners, et al. v. Deloitte & Touche LLP* (05-CV-2770)

---------------------------------------------------------------------- X

OPINION AND ORDER

JESSE M. FURMAN, United States District Judge:

This case is the last pending in the multidistrict litigation ("MDL") arising out of the collapse in 2002 of Adelphia Communications Corporation ("Adelphia"), a company formed by John Rigas — who is serving twelve years in prison for fraud in connection with Adelphia, *see United States v. Rigas*, 583 F.3d 108, 113 (2d Cir. 2009) — and managed in significant part by the Rigas family. This case is different than most in the MDL, however, because it is not brought *against* the Rigases or Rigas entities, but rather *by* John Rigas, James Rigas — the son of John Rigas — and two successors in interest to Rigas entities, Zito I, L.P., ("Zito I") and Zito Media, L.P. ("Zito Media") (collectively, "Plaintiffs"). They bring claims against Deloitte & Touche LLP ("Deloitte"), Adelphia's longtime primary auditor, alleging that the accounting firm was partially responsible for Adelphia's collapse. In an Opinion and Order entered on December 27, 2013, the Court dismissed some of Plaintiffs' claims, including all claims brought by John Rigas. (Docket No. 42).[1] Thereafter, James Rigas, Zito I, and Zito Media filed a second

[1] Unless indicated otherwise, all citations to the Court's docket refer to the docket of this individual case, No. 05-CV-2770, not to that of the MDL, No. 03-MD-1529.

amended complaint (the "Complaint"), alleging claims for breach of contract, breach of professional duty, and negligent misrepresentation. (Docket No. 72).

Defendant now moves, pursuant to Rule 56 of the Federal Rules of Civil Procedure, for summary judgment on all claims. For the reason stated below, Defendant's motion is granted in part and denied in part. Specifically, the claims brought on behalf of James Rigas and Zito I are dismissed, while those brought on behalf of Zito Media survive.

## BACKGROUND

The following facts, taken from the Complaint and the admissible materials submitted by the parties, are viewed in the light most favorable to Plaintiffs, the non-moving parties. *See, e.g.*, *Gould v. Winstar Commc'ns, Inc.*, 692 F.3d 148, 157-58 (2d Cir. 2012).

### A. Adelphia, the Rigas Family, and Deloitte

In the early 1980s, John Rigas hired Deloitte to provide accounting and auditing services to him and several cable companies in which he owned an interest. (Pls.' Counterstatement Facts Supp. Opp'n Deloitte's Mot. Summ. J. (Docket No. 84) ("CSOF") ¶ 2; Second Am. Compl. (Docket No. 72) ("SAC") ¶¶ 16-17, 21). John Rigas ran the companies with his sons James, Timothy, and Michael (collectively, the "Rigases"); in July 1986, they reorganized five of the companies into a single holding company, Adelphia, which they subsequently took public. (SAC ¶¶ 10-12, 28 & n.2). The Rigas family (including John and his sons James, Timothy, and Michael) retained voting control over Adelphia. (*Id.* ¶ 29). In addition, they privately owned another set of companies that were managed by Adelphia: Highland Preferred Communications 2001, LLC ("Highland Preferred"), Highland Prestige Georgia, Inc. ("Highland Prestige"), Highland Video Associates, L.P. ("Highland Video"), and Hilton Head Communications, L.P. ("Hilton Head") (collectively, "the Managed Entities"). *See United States v. Rigas*, 490 F.3d

208, 212-13 (2d Cir. 2007). (Pls.' Resp. Deloitte & Touche LLP's Statement of Facts Supp. Mot. Summ. J. (Docket No. 83) ("SOF") ¶ 4; CSOF ¶ 7). The Rigas family also established a series of partnerships, including Highland Holdings, G.P. ("Highland Holdings"), that owned Adelphia securities and interests in the Managed Entities (together with the Managed Entities, the "Rigas Family Partnerships" or "RFPs"). (SAC ¶ 37).

Over the next fifteen or so years, Deloitte advised Adelphia and the RFPs with respect to the manner in which certain transactions between and among those entities (known as "related party transactions") were to be documented and disclosed to the public. (*Id.* ¶¶ 78-79). Adelphia, the Rigases, and the RFPs routinely entered loan arrangements and engaged in other cash transfers among themselves. (*Id.* ¶¶ 77-79). The related party transactions among the RFPs, on the one hand, and Adelphia, on the other, were disclosed in Adelphia's financial statements, but only on a net basis rather than a loan-by-loan or transfer-by-transfer basis. *See United States v. Rigas*, 490 F.3d at 215. (SAC ¶ 75).

Beginning in the mid-1990s, Adelphia entered a series of "co-borrowing agreements," transactions in which Adelphia and another entity — frequently, but not always one of the RFPs — jointly signed a borrowing agreement with Adelphia. (*Id.* ¶¶ 81, 88-89, 99-102; CSOF ¶ 25-26). The financing obtained through those agreements was used to expand and upgrade Adelphia operations and to fund additional purchases of Adelphia stock by the RFPs. (SAC ¶¶ 81, 114-115). Deloitte reviewed the agreements, although the extent to which it advised on the proper accounting treatment is disputed. (*Compare id.* ¶¶ 91-92 *with* Def. Deloitte & Touche LLP Answer Pls.' Second Am. Compl. (Docket No. 78) ("Answer") ¶¶ 91-92). The basic characteristics of the arrangements, however, are not disputed for purposes of this motion. Pursuant to the agreements, Adelphia and the other borrower were jointly and severally liable;

both parties could draw on the entire borrowing facility. (SAC ¶¶ 95, 103; *see id.* ¶ 126). Deloitte's review revealed that Adelphia was unlikely to have to repay the funds because the RFPs had an adequate ability to pay. (Answer ¶ 96). Adelphia did not fully disclose its liability under the co-borrowing arrangements, apparently at least in part because of the RFP's apparent ability to repay the debt. (SAC ¶ 96).

As Adelphia expanded between 1986 and the early 2000s, the Rigases purchased sufficient shares of Adelphia stock to retain control over the corporation, even as it issued new shares to the public. *See Rigas*, 490 F.3d at 213-14. (*See also* SAC ¶ 29 (explaining the relationship between Class A shares of common stock available to the public and Class B shares purchased by the Rigas family)). The Rigases employed various methods to compensate Adelphia for the purchased shares, sometimes borrowing money to purchase shares and, later on, causing Adelphia to "reclassify" the co-borrowed debt by shifting the obligations to the RFPs' balance sheets. (SAC ¶ 135; Answer ¶ 135). Adelphia, however, remained jointly and severally liable on the co-borrowed debt even after it was reclassified. *See Rigas*, 490 F.3d at 214-15.

**B. Adelphia's Collapse and the Government Investigations**

In early 2002, the Securities and Exchange Commission ("SEC") announced new guidance on how public companies should disclose off-balance-sheet debt. (SAC ¶ 126). Deloitte promptly held a conference with Adelphia management to discuss, *inter alia*, the co-borrowing facilities. (Answer ¶ 131). In light of the new guidance, Adelphia determined that it must disclose the existence of the co-borrowing facilities and their material terms, but that the new guidance did not necessarily mean Adelphia's prior disclosures had been deficient. (SAC ¶¶ 126, 131). In March 2002, before Adelphia's 2001 10-K release and before Deloitte issued a

formal audit opinion, Adelphia published an earnings report that revealed the co-borrowing agreements, and held a conference call with analysts to discuss its earnings results. (*Id.* ¶ 140).

Shortly thereafter, the SEC began to investigate Adelphia's accounting treatment and disclosure of the co-borrowing agreements. (*Id.* ¶ 143). Deloitte never signed its 2001 audit opinion, and Adelphia could not issue its 2001 10-K. (CSOF ¶¶ 67-68). Adelphia consequently defaulted on various agreements, its stock declined in value, and NASDAQ ultimately delisted it in June 2002. (CSOF ¶ 71; SAC ¶ 152; Answer ¶ 152). The RFPs, whose value was tied to Adelphia's in various ways, lost value as well. (SAC ¶ 154).

Following Adelphia's collapse, the federal government brought civil and criminal charges against Adelphia and members of the Rigas family. The SEC filed an action against Adelphia and John, James, Timothy, and Michael Rigas, and federal prosecutors indicted John and Timothy Rigas, among others, on criminal charges relating to the practices discussed above, including Adelphia's treatment of netting, co-borrowing arrangements, purchases of Adelphia securities, and marketing support agreements. (Decl. Timothy E. Hoeffner Supp. Mot. Summ. J. (Docket No. 77) ("Hoeffner Decl."), Ex. E (Superseding Indictment of John J. Rigas et al., *United States v. Rigas et al.*, 02-CR-1236); *id*., Ex. G (Complaint, *SEC v. Adelphia Commc'ns Corp.*, 02-CV-5776)). John and Timothy were eventually convicted of conspiracy, securities fraud, and bank fraud, and sentenced principally to 12 and 17 years, respectively. (Hoeffner Decl., Ex. H (Special Verdict Form, *United States v. Rigas et al.*, 02-CR-1236); *United States v. Rigas*, 583 F.3d 108, 113 (2d Cir. 2009)).

Following the convictions of John and Timothy, the Rigas family entered into a global settlement with the Government, pursuant to which the members of the family forfeited nearly all of their interests in Adelphia and the RFPs to the Government. (Hoeffner Decl., Ex. F

("Government-Rigas Settlement Agreement")). Prior to the forfeiture, Highland Holdings, Highland Preferred, Highland Prestige, Highland Video, and Hilton Head purportedly transferred all assets not necessary to comply with the settlement agreement to Zito I, including their litigation rights against Deloitte. (Decl. Lawrence G. McMichael Opp'n Def.'s Mot. Summ. J. (Docket No. 85) ¶ 12; SAC ¶¶ 175-76; *id.*, Exs. A & B). Coudersport Television Cable Company ("Coudersport") was not forfeited to the Government, and subsequently became Zito Media. (Government-Rigas Settlement Agreement, Exs. B & C; SAC ¶¶ 3, 178; SOF ¶ 1).

**C. Procedural History**

Plaintiffs initially brought this suit against Deloitte in 2004 in the Court of Common Pleas of Philadelphia County. (Decl. Timothy Hoeffner Supp. Mot. Dismiss Am. Compl. (Docket No. 25), Ex. D). Thereafter, the case was removed to the United States District Court for the Eastern District of Pennsylvania. In 2005, the Judicial Panel on Multidistrict Litigation transferred the case to this Court as part of the MDL relating to Adelphia's collapse. (Docket No. 1). In October 2012, the matter was reassigned to the undersigned. (Docket No. 3). In December 2013, the Court granted in part and denied in part Defendant's motion to dismiss, leaving only Plaintiffs' professional negligence and negligent misrepresentation claims. *See In re Adelphia Commc'ns Corp. Sec. & Derivative Litig.*, 05-CV-2770 (JMF), 2013 WL 6838899 (S.D.N.Y. Dec. 27, 2013). Thereafter, the Court granted Plaintiffs leave to file a second amended complaint repleading its breach-of-contract claim. (Docket Nos. 71-72). Defendant seeks summary judgment with respect to that complaint.

## LEGAL STANDARDS

Summary judgment is appropriate where the admissible evidence and the pleadings demonstrate "no genuine dispute as to any material fact and the movant is entitled to judgment as

a matter of law." Fed. R. Civ. P. 56(a); *see also Johnson v. Killian*, 680 F.3d 234, 236 (2d Cir. 2012) (per curiam). An issue of fact qualifies as genuine if the "evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *accord Roe v. City of Waterbury*, 542 F.3d 31, 35 (2d Cir. 2008). The moving party bears the initial burden of demonstrating the absence of a genuine issue of material fact. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986). "In moving for summary judgment against a party who will bear the ultimate burden of proof at trial, the movant's burden will be satisfied if he can point to an absence of evidence to support an essential element of the nonmoving party's claim." *Goenaga v. March of Dimes Birth Defects Found.*, 51 F.3d 14, 18 (2d Cir. 1995) (citing *Celotex*, 477 U.S. at 322-23).

In ruling on a motion for summary judgment, all evidence must be viewed "in the light most favorable to the non-moving party," *Overton v. N.Y. State Div. of Military & Naval Affairs*, 373 F.3d 83, 89 (2d Cir. 2004), and the Court must "resolve all ambiguities and draw all permissible factual inferences in favor of the party against whom summary judgment is sought," *Sec. Ins. Co. of Hartford v. Old Dominion Freight Line, Inc.*, 391 F.3d 77, 83 (2d Cir. 2004). To defeat a motion for summary judgment, the non-moving party must advance more than a "scintilla of evidence," *Anderson*, 477 U.S. at 252, and demonstrate more than "some metaphysical doubt as to the material facts," *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). The non-moving party "cannot defeat the motion by relying on the allegations in [its] pleading or on conclusory statements, or on mere assertions that affidavits supporting the motion are not credible." *Gottlieb v. Cnty. of Orange*, 84 F.3d 511, 518 (2d Cir. 1996) (internal citation omitted).

## DISCUSSION

Deloitte argues that it is entitled to summary judgment with respect to each of Plaintiff's claims, albeit for different reasons. First, it argues that Zito I lacks standing. Second, it argues that James Rigas cannot demonstrate the relationship with Deloitte necessary to pursue his contract and tort claims. Finally, Deloitte argues that Zito Media's claims are barred by the doctrine of *in pari delicto*. The Court considers each of these arguments in turn.

### A. Zito I's Standing To Assert Claims Against Deloitte

Deloitte contends first that Zito I lacks standing to bring any of the claims it pursues here. The question of standing is a "threshold determinant[] of the propriety of judicial intervention," *Warth v. Seldin*, 422 U.S. 490, 518 (1975), and helps ensure that judicial resources are "devoted to those disputes in which the parties have a concrete stake," *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs., Inc.*, 528 U.S. 167, 191 (2000). One "irreducible constitution minimum of standing" is that the plaintiff has "suffered an injury-in-fact, that is, the invasion of a 'legally protected interest' in a manner that is 'concrete and particularized' and 'actual or imminent, not conjectural or hypothetical.'" *Bhatia v. Piedrahita*, 756 F.3d 211, 318 (2d Cir. 2014) (quoting *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992)); *see Lujan*, 504 U.S. at 560 n.1 (holding that the plaintiff must suffer an "injury [that] affect[s] the plaintiff in a personal and individual way"). A party may assert the interests of another party if those interests have been validly assigned, but only a "valid and binding assignment of a claim (or a portion thereof) . . . may confer standing on the assignee." *W.R. Huff Asset Mgmt. Co., LLC v. Deloitte & Touche LLP*, 549 F.3d 100, 107 (2d Cir. 2008) (internal quotation marks and emphasis omitted). The question here is whether Zito I was assigned the litigation rights to bring this suit and thus possesses a legally protected interest sufficient to give it standing.

The parties agree that if Zito I possesses a legally protected interest, it is derived from one of the Managed Entities or Rigas Family Partnerships — namely, Highland Holdings, Highland Preferred, Highland Prestige, or Highland Video. (SOF ¶ 4; SAC ¶ 2). In the settlement agreement between the Rigas family and the Government, however, the members of the Rigas family explicitly and unambiguously forfeited to the United States "all of their respective interests" in those entities. (Government-Rigas Settlement Agreement ¶¶ 3-4 & Ex. C; SOF ¶ 36).[2] Notably, in two instances, the settlement agreement expressly excluded assets owned by Managed Entities or RFPs. (*See* Government-Rigas Settlement Agreement ¶ 7 & Ex. C n.1 (explaining that Highland Video's interest in Bucktail Broadcasting Corporation was not to be forfeited); *id.*, Ex. B (omitting Coudersport Television Cable Company from the list of Forfeited Entities)). Between the settlement agreement's application to "all . . . interests" of the Managed Entities and RFPs, and the presence of two explicit exceptions, it is plain that any Managed Entity or RFP assets not expressly exempted — including all of those that could conceivably give rise to a legally protected interest on the part of Zito I — were transferred to the Government.

Plaintiffs do not seriously dispute the foregoing interpretation of the settlement agreement, but rather rely on other evidence — including statements allegedly made by the Government in negotiations over the agreement — to assert that the parties did not intend for the forfeiture to include the entities' litigation rights against Deloitte. (Pls.' Mem. Law Opp'n Def.'s Mot. Summ. J. (Docket No. 81) ("Pls.' Mem.") 12-14; CSOF ¶¶ 77-84; Hoeffner Decl., Ex. C,

---

[2] The settlement agreement did not expressly refer to Highland Preferred (*see* Government-Rigas Settlement Agreement, Ex. C), but Highland Preferred was wholly owned by Highland Holdings (SOF ¶ 7), which was among the entities forfeited in the settlement agreement. Accordingly, Highland Preferred's assets were also forfeited to the Government.

Specific Objections and Responses to Def.'s Requests ¶ 4; SAC ¶¶ 175-76). The settlement agreement, however, contains an "integration clause," providing that "[t]his Agreement constitutes the entire agreement of the parties with respect to the subject matter hereof. This Agreement shall not be modified, supplemented, amended or otherwise changed, or any of its provisions waived, in any matter whatsoever except by written instrument signed by the Parties." (Government-Rigas Settlement Agreement ¶ 17). Accordingly, Plaintiffs may not rely on extrinsic evidence of the parties' intent in interpreting unambiguous provisions of the agreement. *See, e.g.*, *Topps Co. v. Cadbury Stani S.A.I.C.*, 526 F.3d 63, 69 (2d Cir. 2008) (stating that the parol evidence rule "bars admission of extrinsic evidence" to contradict unambiguous terms in an integrated agreement); *accord Schron v. Troutman Sanders LLP*, 986 N.E.2d 430, 433-34 (N.Y. 2013); *see also, e.g.*, *In re World Trade Ctr. Disaster Site Litig.*, 754 F.3d 114, 121 (2d Cir. 2014) (noting that settlement agreements are contracts and "must be construed in accordance with general principles of contract law").[3]

Plaintiffs also argue that Zito I acquired the relevant entites' litigation rights before the settlement agreement went into effect. (SAC ¶ 175; *see* Pls.' Mem. 11-17). That argument fails, however, because the forfeiture of litigation rights "related back" to the criminal conduct that precipitated the forfeiture. *In re Century/ML Cable Venture*, 311 F. App'x 455, 457 (2d Cir. 2009) (summary order). As the Court of Appeals explained in *Century/ML Cable Venture* — which rejected a similar argument with respect to the transfer of a breach-of-contract claim from

[3] The settlement agreement has no choice of law provision and the parties do not address whether New York or Pennsylvania law should apply to the agreement. In any event, there is no meaningful difference between the two states' parol evidence rules. *Compare Yocca v. Pittsburgh Steelers Sports, Inc.*, 854 A.2d 425, 436 (Pa. 2004), *with Schron*, 986 N.E.2d at 433-34.

Highland Holdings to Zito I — under "the relation-back doctrine, the forfeiture occurs when the crime is committed and therefore, [the defendant] had no property interest in the [forfeited asset] as of that moment." 311 Fed. App'x at 457 (quoting *United States v. U.S. Currency*, 895 F.2d 908, 916 (2d Cir.1990)); *see United States v. $557,933.89, More or Less, in U.S. Funds*, 287 F.3d 66, 77 (2d Cir. 2002); *see also, e.g.*, *In re Dreier LLP*, 429 B.R. 112, 120, 126 (Bankr. S.D.N.Y. 2010) (holding that the relation-back doctrine applies even where forfeiture occurs pursuant to a settlement agreement). It follows that, to the extent relevant here, litigation rights against Deloitte were forfeited to the Government, and that Zito I does not possess any legally protected interest on which it can rely in this case. Accordingly, for the same reasons that the Court of Appeals found a lack of standing in *Century/ML Cable Venture*, the Court concludes that Zito I lacks standing and all of its claims must be dismissed.

**B. James Rigas's Breach-of-Contract and Negligence Claims**

Next, Deloitte argues that it is entitled to summary judgment with respect to James Rigas's contract and tort claims because James Rigas and Deloitte lacked the relationship of privity necessary to sustain those claims.[4] Under Pennsylvania law (which the parties agree applies (Pls.' Mem. 17, 21; Def.'s Mem. 12-13)), claims for breach of contract, professional negligence, and negligent misrepresentation — the claims brought by James Rigas — generally require privity of contract. *See, e.g.*, *Evans v. Otis Elevator Co.*, 168 A.2d 573, 575 (Pa. 1961) (breach of contract); *Viso v. Werner*, 369 A.2d 1185, 1187 (1977) (same); *Landell v. Lybrand*, 107 A. 783, 783 (Pa. 1919) (per curiam) (professional negligence); *Williams Controls, Inc. v.*

---

[4] Defendant makes the same argument with respect to Highland Holdings and Highland Preferred (Deloitte & Touche LLP's Mem. Law Supp. Mot. Summ. J. (Docket No. 74) ("Def.'s Mem.") 11-14), but the Court need not (and arguably may not) reach that argument in light of its conclusion above that any litigation rights of Highland Holdings and Highland Preferred were forfeited to the Government.

*Parente, Randolph, Orlando, Carey & Assocs.*, 39 F. Supp. 2d 517, 523-27 (M.D. Pa. 1999) (same); *Meyer v. Cmty. Coll. of Beaver Cnty.*, 2 A.3d 499, 502 n.5 (Pa. 2010) (negligent misrepresentation); *see In re Phar-Mor, Inc. Sec. Litig.*, 892 F. Supp. 676, 694 (W.D. Pa. 1995). Pennsylvania courts, however, have fashioned slightly different standards and exceptions for each claim. Thus, the Court will address each in turn.

**1. Breach of Contract**

With respect to the breach-of-contract claims, it is James Rigas's burden to prove by a preponderance of the evidence the existence of a contract. *See, e.g.*, *Viso*, 369 A.2d at 1187. Plaintiffs contend, first, that James Rigas and Deloitte had an express contract, but that contention fails as it is undisputed that James Rigas was not a party to any of the written agreements between Deloitte and either Adelphia or the RFPs. (SOF ¶ 16; CSOF ¶¶ 16-23). Plaintiffs suggest that the engagement letters between Deloitte, the RFPs, and Adelphia created a "contractual duty" owed by Deloitte to James Rigas in his management capacity with Adelphia and the RFPs. (Pls.' Mem. 19). The engagement letters, however, were between Deloitte, on the one hand, and Adelphia and several RFPs, on the other. (*See, e.g.*, Decl. Christine Callahan Comerford Opp'n Def.'s Mot. Summ. J. (Docket No. 82), Ex. V ("1999 Engagement Letter"), at DT 202336). Moreover, the letters make clear that Deloitte will report to Adelphia's "Audit Committee" — an entity acting on behalf of the corporation. (*Id.* at DT 202332-33). Any duties on the part of Deloitte were therefore owed to Adelphia or other parties to the agreement, not to members of its management. *See Phar-Mor*, 892 F. Supp. at 694.

Nor do any of Deloitte's alleged oral statements establish an agreement with James Rigas. Plaintiffs argue that Defendant's repeated dealings with the Rigases and its statement to James Rigas that Deloitte could continue to represent the RFPs even after Adelphia went public

formed an agreement between Deloitte and James Rigas. (Pls.' Mem. 19-20; *see* Decl. James Rigas Opp'n Def.'s Mot. Summ. J. (Docket No. 87) ("James Rigas Decl.") ¶¶ 6-10). Plaintiffs, however, have failed to adduce any evidence that those statements were intended as the basis for a binding agreement, much less one between Deloitte and James Rigas, as opposed to one between Deloitte and Adelphia or the RFPs. *See, e.g.*, *Perlman v. Pittsburgh Cabinets & Builders Supplies, Inc.*, 156 A.2d 373, 375 (Pa. Super. Ct. 1959) (noting that when a principal is disclosed, an agent generally does not become a party to a contract). Indeed, Plaintiffs identify no evidence suggesting that the statements were made to James Rigas in his individual capacity rather than in his management capacities with the RFPs and Adelphia. Absent such evidence, there is no genuine question of fact as to the existence of an express contract.

Next, Plaintiffs' argument that there existed an implied agreement Deloitte and James Rigas fails for similar reasons. In Pennsylvania, a "contract implied in fact is an actual contract which arises where the parties agree upon the obligations to be incurred, but their intention, instead of being expressed in words, is inferred from acts in the light of the surrounding circumstances." *Liss & Marion, P.C. v. Recordex Acquisition Corp.*, 983 A.2d 652, 659 (Pa. 2009) (internal quotation marks omitted). As noted, Plaintiffs do not identify any facts suggesting that James Rigas himself entered a contract with Deloitte or that any of his dealings with Deloitte were in his individual capacity rather than as a manager for the RFPs and Adelphia. Nor do Plaintiffs identify any "surrounding circumstances" indicating that James Rigas reasonably understood he had a contract with Deloitte in his individual capacity. Put simply, there is no more than "a scintilla of evidence," *Anderson*, 477 U.S. at 252, suggesting that Deloitte created an implied contract with James Rigas.

Finally, Plaintiffs fail to raise a triable issue of fact as to whether James Rigas was a third-party beneficiary of the agreement between Deloitte and Adelphia and the RFPs. Under Pennsylvania law, a party

> becomes a third party beneficiary only where both parties to the contract express an intention to benefit the third party in the contract itself, *unless* the circumstances are so compelling that recognition of the beneficiary's right is appropriate to effectuate the intention of the parties, and the performance satisfies an obligation of the promisee to pay money to the beneficiary or the circumstances indicate that the promisee intends to give the beneficiary the benefit of the promised performance.

*Scarpitti v. Weborg*, 609 A.2d 147, 150-51 (Pa. 1992) (internal citation omitted). Here, as noted, Plaintiffs identify no evidence suggesting that the parties to the contract intended to benefit James Rigas individually. To the extent James Rigas benefitted from the contract, it was in his capacity as a manager and a shareholder — which does not suffice to make him a third-party beneficiary in his individual capacity. *See, e.g.*, *Tredennick v. Bone*, 323 F. App'x 103, 104 (3d Cir. 2008) (holding that a majority shareholder is not the intended beneficiary of a contract with the company absent express intent in the contract). Accordingly, Defendant's motion for summary judgment on James Rigas's contract claims must be granted.

**2. Tort Claims**

As noted above, privity is generally necessary to prevail on claims of professional negligence and negligent misrepresentation as well. Given that Plaintiffs fail to establish any privity between James Rigas and Deloitte, they are left to rely on certain exceptions to the requirement for those claims. (Pls.' Mem. 21-22). This case, however, does not fit within the narrow exceptions that have been recognized by Pennsylvania courts.

First, the Pennsylvania Supreme Court has stated that a professional negligence claim may be brought where the defendant entered a "specific undertaking" to provide professional

services. *Guy v. Liederbach*, 459 A.2d 744, 750 (Pa. 1983).[5] Plaintiffs argue that this language creates an exception to the privity requirement and that, even if James Rigas was not in privity with Deloitte, their dealings represented a "specific undertaking" sufficient to form the basis of a professional negligence claim. (Pls.' Mem. 21-22). For the "specific undertaking" standard to be met, however, a plaintiff must demonstrate a "bond so close as to approach that of privity." *Brandow Chrysler Jeep Co. v. DataScan Techs.*, 511 F. Supp. 2d 529, 538 (E.D. Pa. 2007) (internal quotation marks omitted). Indeed, the *Guy* Court expressly noted that its holding did "not eliminate the privity requirement in malpractice actions based on negligence." *Guy*, 459 A.2d at 750; *see Williams*, 39 F. Supp. 2d at 526-27 (concluding that *Guy* "firmly reaffirmed the requirement of privity in professional malpractice cases"). Here, substantially for the reasons that Plaintiffs fail to establish privity between James Rigas and Deloitte, they fail to identify a sufficiently close bond between the two for the "specific undertaking" exception to apply. Put simply, Plaintiffs identify only vague statements allegedly made by Deloitte to James Rigas (James Rigas Decl. ¶¶ 4-9), and give no reason to believe that the statements were made to James Rigas in his individual capacity.

To salvage James Rigas's negligent misrepresentation claim, Plaintiffs rely on *Bilt-Rite Contractors, Inc. v. The Architectural Studio*, 866 A.2d 270, 287 (Pa. 2005). (Pls.' Mem. 22). In that case, a contractor who followed certain architectural plans brought a negligent misrepresentation claim against the architecture firm that had prepared the plans. Adopting Section 552 of the Restatement (Second) of Torts (1977), the Pennsylvania Supreme Court held that privity may not be required "where information is negligently supplied by one in the

[5] The *Guy* Court also recognized an exception to the privity requirement for certain third-party beneficiaries, *see Guy*, 459 A.2d at 750; *see also Scarpitti*, 609 A.2d at 150, but, for the reasons discussed above, James Rigas was not a third-party beneficiary.

business of supplying information, such as an architect or design professional, and where it is foreseeable that the information will be used and relied upon by third persons." *Bilt-Rite Contractors*, 866 A.2d at 287. It is not clear, however, that the *Bilt-Rite Contractors* exception applies to suits against accountants and auditors. *See, e.g.*, *Phar-Mor*, 892 F. Supp. at 693 (noting that the privity rule in cases against accountants "would be swallowed by an exception for negligent misrepresentation claims since an accountant always makes a representation, *i.e.*, a report, which is often then reviewed by nonparties to the contract for various reasons"). And even if it does, it applies "only to those persons for whose benefit and guidance [the alleged misrepresentation] is supplied," Restatement § 552, cmt. H, and only if the plaintiff has relied on the alleged misrepresentation "in the course of [its] own business activities," *Bilt-Rite Contractors*, 866 A.2d at 285-86. As noted, however, there is no evidence in the record here that Deloitte provided advice for the benefit of James Rigas in his individual capacity and no evidence that James Rigas relied on Deloitte's advice in connection with his own business activities as opposed to Adelphia's or the RFPs'.

In short, Plaintiffs fail to establish that this case falls within any exception to the privity requirement for professional negligence or negligent misrepresentation claims. Accordingly, those claims, like James Rigas's breach-of-contract claims, must be dismissed.

### *C. In Pari Delicto*

Finally, Deloitte moves for summary judgment with respect to all claims brought by Zito Media, as successor in interest of Coudersport. (Def.'s Mem. 14-15; Deloitte & Touche LLP's Reply Mem. Law Further Supp. Mot. Summ. J. (Docket No. 88) ("Def.'s Reply Mem.") 9-10). Specifically, Defendant argues that Zito Media's claims should be dismissed for the same reason that the Court previously dismissed the claims of John Rigas: namely, that they are barred by the

doctrine of *in pari delicto*, "an application of the principle that no court will lend its aid to a man who grounds his actions upon an immoral or illegal act." *Joyce v. Erie Ins. Exchange*, 74 A.3d 157, 162 (Pa. Super. Ct. 2013) (quoting *Feld & Sons, Inc. v. Pechner, Dorfman, Wolfee, Rounick & Cabot*, 458 A.2d 545, 548 (Pa. Super. Ct. 1983) (internal quotation marks omitted)). (Def.'s Mem. 14-15). As Deloitte puts it: "Coudersport, an entity wholly owned and controlled by John Rigas, is subject to the *in pari delicto* defense precisely to the same extent as was its sole owner, John Rigas." (Def.'s Mem. 2).

This argument can be swiftly rejected. Under Pennsylvania law — which the parties agree applies here as well (Def.'s Mem. 14; Pls.' Mem. 22-23) — whether and when a person's wrongdoing can be imputed to a company of which he is an officer or sole shareholder for purposes of *in pari delicto* is somewhat unsettled. *See, e.g.*, *Bechtle v. Master, Sidlow & Associates, P.A.*, 766 F. Supp. 2d 547, 555 n.1 (E.D. Pa. 2011); *see also Official Comm. of Unsecured Creditors of Allegheny Health Educ. & Research Found. v. PriceWaterhouseCoopers, LLP*, 989 A.2d 313, 331 (Pa. 2010) ("AHERF") (stating in *dictum* that "[w]ere the action between a corporation *controlled by a single individual* and a sole-proprietor auditor, there would be a good case to be made that *in pari delicto* should apply to negate all causes of action" (emphasis added)). At a minimum, however, for such "imputation" to apply, the defendant must show that the officer committed the fraud "in the course of his employment." *Official Comm. of Unsecured Creditors v. R.F. Lafferty & Co.*, 267 F.3d 340, 358 (3d Cir. 2001), *abrogated in other respects by AHERF*, 989 A.2d at 332 n.25; *see also AHERF*, 989 A.2d at 333 (noting that "agency law plays a pivotal role in the defense's practical availability"). In this case, Deloitte may ultimately be able to make that showing — after all, John Rigas was convicted of fraud in connection with his dealings with the Managed Entitie and

RFPs, one of which was Coudersport — but, drawing all inferences in Plaintiffs' favor, the Court cannot say that it has done so sufficiently to grant it summary judgment. At bottom, Deloitte points to little more than the indictment against John Rigas and the jury's verdict in the criminal trial. (Def.'s Mem. 14-15; Deloitte & Touche LLP's Supplemental Mem. Law Further Supp. Mot. Summ. J. (Docket No. 91) 2-3). The indictment, however, is hearsay, and thus not evidence upon which the Court can rely. *See, e.g.*, *Ruffalo's Trucking Serv. v. Nat'l Ben-Franklin Ins. Co.*, 243 F.2d 949, 953 (2d Cir. 1957) ("The indictment, since it was only hearsay, was clearly inadmissible for any purpose." (citing 3 Wigmore, Evidence § 980a (3d ed. 1940))); *In re WorldCom, Inc. Sec. Litig.*, No. 02-CV-3288 (DLC), 2005 WL 375315, at *9 (S.D.N.Y. Feb. 17, 2005) (rejecting a similar use of indictments as inadmissible "hearsay, since the only purpose [was] to offer the documents for the truth of the statements contained in them"); *see also id.* ("The Government cannot rely on an indictment to prove its case at trial, and the parties here cannot rely on the Government's indictment to prove theirs."). And while the jury necessarily found that John Rigas engaged in fraud — making application of the *in pari delicto* against him an easier call — given the general nature of the jury's verdict, it cannot be said that the jury necessarily found that he did so in his capacity as an officer or sole shareholder of Coudersport as opposed to his capacity as an officer of Adelphia or the other entities. Thus, Deloitte has not shown that it is entitled to judgment as a matter of law with respect to Zito Media's claims.

## CONCLUSION

For the foregoing reasons, Defendant's motion for summary judgment is GRANTED in part and DENIED in part, and all claims are dismissed except for Zito Media's claims. As the parties agreed during the March 10, 2014 conference before the Court, trial of those claims must take place in the Pennsylvania Court of Common Pleas of Philadelphia County, not this Court.

Accordingly, unless one of the remaining parties shows good cause to do otherwise within two weeks of this Opinion and Order, the case will be remanded to that Court without further notice.

The Clerk of Court is directed to terminate 05-CV-2770 Docket No. 73 and 03-MD-1529 Docket No. 881.

SO ORDERED.

Date: December 10, 2014
New York, New York

JESSE M. FURMAN
United States District Judge